UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ADRIANO LADEWIG, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>BIONTECH SE, UGUR SAHIN, and JENS HOLSTEIN<br><br>　　　　　Defendants. | Case No. 1:24-cv-05310-KPF |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT
<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .................................................................................................................. 3

      A.     BioNTech and the Individual Defendants ................................................. 3

      B.     BioNTech Develops Comirnaty, the First COVID-19 Vaccine Approved for Human Use ................................................................................................. 3

      C.     The U.S. and E.U. Member States Order Billions of Comirnaty Doses ................. 4

      D.     BioNTech and Pfizer Agree with the EC to Delay and Re-Phase Comirnaty Shipments ............................................................................... 5

      E.     BioNTech Warns of Continued Demand Fluctuation in Late 2022. ...................... 6

      F.     BioNTech Warns that 2023 Could be a "Trough Year" for Comirnaty Demand. ................................................................................................. 7

      G.     The FDA Recommends a Monovalent Vaccine in Response to a New Variant and BioNTech Cautions Investors About the Potential Impact on Revenue. ......... 8

      H.     Plaintiffs' Complaint ................................................................................. 9

ARGUMENT ...................................................................................................................... 9

I.     PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION. ................................................................................................... 10

      A.     None of the Challenged Statements was Materially False or Misleading. ........... 11

            1.     Statements Concerning Vaccine Contracts with the EC .......................... 11

            2.     Statements Concerning Inventory Write-Offs. ....................................... 15

      B.     The PSLRA Safe Harbor for Forward-Looking Statements Protects BioNTech's Statements About Expected Dose Commitments and Demand. ...... 18

II.    PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER. ............. 20

      A.     Plaintiffs Do Not Plead Scienter Based on Motive and Opportunity. .................. 20

      B.     Plaintiffs Fail to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness. ................................................................. 21

      C.     The Most Compelling Inference from the Facts Alleged is Non-Fraudulent. ...... 25

III.   PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM. ..................................... 25

CONCLUSION .................................................................................................................. 25

APPENDIX (Chart of Alleged Misstatements) ........................................................... A-1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..............................................................................23

*In re AT&T/DirecTV Now Sec. Litig.*,
2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020), *aff'd*, 2022 WL 17587853
(2d Cir. Dec. 13, 2022) ...........................................................................................................23, 25

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................................................3, 20

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013).......................................................................................17

*In re Barclays PLC Sec. Litig.*,
2024 WL 757385 (S.D.N.Y. Feb. 23, 2024).............................................................................17

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .......................................................................14, 16

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ................................................................................................16

*Bratusov v. Comscore, Inc.*,
2020 WL 3447989 (S.D.N.Y. June 24, 2020) .........................................................................20

*C.D.T.S. v. UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd*, 604 F. App'x 5 (2d Cir. 2015)..............10

*City of Brockton Ret. Sys. v. Shaw Grp.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008).......................................................................................24

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).......................................................................................21

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022).........................................................................................19

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .........................................................................12

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .........................................................................23

*Diabet v. Credit Suisse Grp. AG,*
    2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024).........................................................................10

*Dobina v. Weatherford Int'l Ltd.,*
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)......................................................................................22

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,*
    553 F.2d 187 (2d Cir. 2009).....................................................................................................20

*In re EHang Holdings Ltd. Sec. Litig.,*
    646 F. Supp. 3d 443 (S.D.N.Y. 2022)......................................................................................20

*In re eSpeed, Inc. Sec. Litig.,*
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)......................................................................................25

*In re Express Scripts Holdings Co. Sec. Litig.,*
    773 F. App'x 9 (2d Cir. 2019) .................................................................................................12

*In re Ferroglobe PLC Sec. Litig.,*
    2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020)...........................................................................16

*Glaser v. The9, Ltd.,*
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................................23

*Hawes v. Argo Blockchain PLC,*
    2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024) ..............................................................................3

*In re HEXO Corp. Sec. Litig.,*
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)......................................................................................19

*Holbrook v. Trivago N.V.,*
    2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd*, 796 F. App'x 31 (2d Cir. 2019).............17

*Jones v. Perez,*
    550 F. App'x 24 (2d Cir. 2013) ...............................................................................................23

*In re JP Morgan Chase Sec. Litig.,*
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................................25

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001).....................................................................................................20

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F.2d 161 (2d Cir. 2005).....................................................................................................25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.,*
    601 U.S. 257 (2024)..................................................................................................................10

*Marcu v. Cheetah Mobile Inc.*,
　2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..........................................................................17

*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
　2024 WL 2890968 (2d Cir. June 10, 2024) ............................................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011) ..................................................................................................................11

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
　2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........................................................................16

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
　423 F. Supp. 2d 364 (S.D.N.Y. 2006) .....................................................................................22

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000) ...................................................................................................10

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
　2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ........................................................................25

*Ong v. Chipotle Mexican Grill, Inc.*,
　294 F. Supp. 3d 199 (S.D.N.Y. 2018) .....................................................................................19

*Pearlstein v. BlackBerry Ltd.*,
　93 F. Supp. 3d 233 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 23 (2d Cir. 2016) ....................22, 24

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
　11 F.4th 90 (2d Cir. 2021) ...............................................................................................11, 15

*Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*,
　2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017)*, aff'd*, 773 F. App'x 630 (2d Cir. 2019).........12

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
　694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...............................................................................21, 24

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
　2023 WL 3569068 (S.D.N.Y. May 19, 2023) .........................................................................15

*In re PXRE Grp., Ltd., Sec. Litig.*,
　600 F. Supp. 2d 510 (S.D.N.Y. 2009) .....................................................................................21

*Rein v. Dutch Bros, Inc.*,
　2024 WL 3105004 (S.D.N.Y. June 24, 2024) .........................................................................12

*Ressler v. Liz Claiborne, Inc.*,
　75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 460 (2d Cir. 1999) ................................10

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. FXCM, Inc.*,
   767 F. App'x 139 (2d Cir. 2019) ...................................................................................21

*Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton
   Interactive, Inc.*,
   665 F. Supp. 3d 522 (S.D.N.Y. 2023)................................................................14, 18, 19

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..........................................................................................25

*Saraf v. Ebix, Inc.*,
   632 F. Supp. 3d 389 (S.D.N.Y. 2022).............................................................................24

*Schiro v. Cemex*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019).............................................................................24

*In re Sina Corp. Sec. Litig.*,
   2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006)...............................................................17

*Sing v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)...............................................................................................9

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010).....................................................................................10, 18

*Solow v. Citigroup, Inc.*,
   2012 WL 1813277 (S.D.N.Y. May 18, 2012), *aff'd*, 507 F. App'x 81 (2d Cir. 2013)............16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)...........................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...........................................................................................1, 3, 9, 20

*Thesling v. Bioenvision, Inc.*,
   374 F. App'x 141 (2d Cir. 2010) ....................................................................................11

*In re Tibco Software, Inc.*,
   2006 WL 146965 (N.D. Cal. May 25, 2006).................................................................21

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)............................................................................19

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sep. 28, 2012)................................................................24

*Wilbush v. Ambac Fin. Grp., Inc.*,
   271 F. Supp. 3d 473 (S.D.N.Y. 2017)............................................................................14

**Statutes**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934)......................... *passim*

15 U.S.C. § 78t(a) (Section 20(a) of the Securities Exchange Act of 1934) ................................25

15 U.S.C. § 78u-4 ........................................................................................................10, 20

15 U.S.C. § 78u-5 ........................................................................................................18, 19

**Regulations**

17 C.F.R. § 240.10b-5................................................................................................... 9, 11

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................9, 10

Fed. R. Civ. P. 12(b) .........................................................................................................3

**PRELIMINARY STATEMENT**

This putative securities class action is precisely what Congress intended to deter when it enacted the Private Securities Litigation Reform Act of 1995 (the "PSLRA") as "a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). In a complaint that contravenes Congressional intent and settled case law, Plaintiffs attempt to divine "fraud" from actions and events that were plainly not fraudulent. In so doing, they are wrongfully attempting to use the federal securities laws to take advantage of BioNTech SE ("BioNTech" or the "Company"), which, along with Pfizer, Inc. ("Pfizer"), developed and commercialized the first COVID-19 vaccine ("Comirnaty").

Plaintiffs' theory of "fraud" relies entirely upon impermissible pleading by hindsight. Their amended complaint (the "Complaint") alleges that BioNTech, along with its CEO (Ugur Sahin) and CFO (Jens Holstein, together with Sahin, the "Individual Defendants"), should be held liable under the Securities Exchange Act of 1934 (the "Exchange Act") because they failed to predict and disclose that: (1) demand for Comirnaty would decline over time; and (2) BioNTech would report an October 2023 inventory write-off occasioned by data Pfizer reported to it after the Company's quarter close. This is not "fraud," and the Complaint, which lacks *any* particularized factual support for its claims, does not come close to meeting the PSLRA's heightened pleading standards. It should be dismissed with prejudice for multiple reasons.

*First*, the Complaint does not allege any actionable misstatements or omissions. Plaintiffs claim that Defendants misled investors by omission. But Defendants' challenged statements—the accuracy of which Plaintiffs do not dispute—did not impart a duty to make predictions about the topics that were purportedly concealed: *future* demand trends and the magnitude of *future* inventory write-offs. This is misguided for several reasons, including because making such predictions with the precision Plaintiffs suggest was necessary would have required an intuition

1

akin to clairvoyance.   Regardless, BioNTech *did* disclose the information available to it. Throughout the putative class period, the Company warned, among other things, of "fluctuat[ing]" demand for Comirnaty and the risk that vaccine reformulations to combat mutated strains of the virus could precipitate inventory write-offs.  When certain of these risks began to materialize, BioNTech was transparent with investors.  These robust disclosures, which Plaintiffs ignore, but which the market readily absorbed, undermine Plaintiffs' claims of concealment.  Additionally, many of the challenged statements, which disclosed "expectations" about Comirnaty-derived revenue, are also shielded by the PSLRA Safe Harbor for forward-looking statements.

*Second*, Plaintiffs' claims fail because the Complaint does not allege a strong inference of scienter.  Plaintiffs do not: identify any specific, let alone contemporaneous, facts Defendants allegedly knew that contradicted their public statements; adduce circumstantial evidence to support their theory of fraud; or even allege that any Defendant had a fraudulent motive.  Instead, they rely on a series of disfavored bases for pleading scienter, including the Individual Defendants' corporate seniority and the "core operations" doctrine to impute foresight of facts Defendants did not—and could not—have known.  Compounding these defects, Plaintiffs also rely upon an irrelevant observation from a low-level employee at *Pfizer* who is not alleged to have communicated with the Individual Defendants about *any* matters, let alone the issues in this case. None of these allegations, whether viewed alone or in the aggregate, amounts to more than speculation.  And they certainly do not create the coherent, compelling, or "strong" inference of scienter required by the PSLRA, a reality that dooms the Complaint.

 Accordingly, for all these reasons, further discussed below, the Court should dismiss this action with prejudice.

## BACKGROUND[1]

### A.    BioNTech and the Individual Defendants.

BioNTech is a German biotechnology company that, since its founding in 2008, has specialized in the development of vaccines and immunotherapies for cancer and infectious diseases. (¶ 30.)[2] The Company's American Depositary Shares ("ADSs") trade on the NASDAQ Global Select Market. (¶ 24.) Defendant Sahin is both the CEO and founder of BioNTech. (¶ 25.) Defendant Holstein, who joined BioNTech in July 2021, served as BioNTech's CFO throughout the Class Period. (¶ 26.)

### B.    BioNTech Develops Comirnaty, the First COVID-19 Vaccine Approved for Human Use.

Within months of health authorities identifying the SARS-CoV-2 virus in China in late 2019, the World Health Organization designated the virus a global threat and declared the first pandemic in over a century. By mid-2020, COVID-19, the disease caused by the virus, had killed millions of people worldwide, stalled the global economy, and brought society to a standstill. In the wake of this upheaval, BioNTech initiated the BNT162 vaccine program, the goal of which was to create a COVID-19 vaccine using mRNA-based technology. (¶¶ 2, 32.)

---

[1] On motions to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Defendants submit, as exhibits to the Eichenberger Declaration (referenced herein as "Ex. __"), certain public statements and SEC filings that may be considered on this motion. *See ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) (courts consider "public disclosure documents"). Defendants also provide, in an appendix hereto and for the Court's convenience, a chart identifying each of alleged misstatements in the Complaint. *See Hawes v. Argo Blockchain PLC*, 2024 WL 4451967, at *2 n.1 (S.D.N.Y. Oct. 9, 2024) (encouraging the submission of such appendices).

[2] References to "¶ __" are to paragraphs of the Complaint.

On April 9, 2020, BioNTech and Pfizer executed an agreement (the "Collaboration Agreement") pursuant to which BioNTech would contribute "mRNA vaccine candidates," Pfizer would contribute its "global vaccine clinical research and development, regulatory, manufacturing and distribution infrastructure," and the parties would share manufacturing responsibilities and split costs and profits for any commercialized vaccines.[3]  (Ex. A at 1; ¶¶ 33-35.)  Pfizer was also responsible for worldwide marketing and distribution of the developed vaccine in countries other than Germany, Turkey, and greater China.  (¶ 33 n.1; Ex. B at 88.)[4]  On December 11, 2020, the FDA granted an Emergency Use Authorization for Comirnaty and, on December 21, 2020, the European Medicines Agency ("EMA") issued a conditional marketing authorization for the vaccine.  (¶ 45.)

### C.     The U.S. and E.U. Member States Order Billions of Comirnaty Doses.

Global demand for a COVID-19 vaccine was "initially overwhelming," prompting developed countries to pre-order large quantities of Comirnaty before its regulatory authorization. (¶ 42.)  Accordingly, by the end of December 2020, the U.S. government had contracted to purchase 200 million doses of Comirnaty (*id.*), and the European Commission ("EC") had contracted to purchase 300 million doses on behalf of E.U. member states (the "EC Purchase Agreement") (¶ 44).  Demand for Comirnaty increased in 2021 as countries worked to vaccinate

---

[3] Notwithstanding the Collaboration Agreement, BioNTech "depend[ed] on Pfizer to determine and provide estimates of the costs and profits to be shared with [BioNTech] in the countries where [Pfizer] is commercializing [the] COVID-19 vaccine." (Ex. B at 9.)  BioNTech further disclosed that "the information supplied by Pfizer" on a quarterly basis was "preliminary." (*Id.*)

[4] The Collaboration Agreement also established a governance framework that included three joint committees consisting of representatives from both companies: (1) a Joint Steering Committee, which "provided operational and strategic oversight of [] development and manufacturing activities;" (2) a Joint Finance Committee, which was responsible for "financial, forecasting, budget and planning matters;" and (3) a Joint Commercialization Committee, "to set pricing, marketing," and facilitate other aspects of commercializing the vaccine.  (¶¶ 38-41.)

their citizens.  By the end of 2021, the U.S. government had agreed to purchase an additional 350 million doses (¶¶ 46, 50), and the EC had agreed to purchase an additional 1.1 billion doses, 450 million of which were scheduled for delivery in 2022 (¶¶ 47-48, 52).

Based on these contractual commitments, BioNTech stated in early 2022 that it expected to deliver up to 2.4 billion doses to the EC by the end of 2023.  (¶ 62.)  It nonetheless warned that, despite this initial success, future revenues from Comirnaty were "uncertain" and mutations in the SARS-CoV-2 virus could render the vaccine obsolete or ineffective (Ex. B at 8):

- "The COVID-19 disease itself is very unpredictable, each variant comes with varying levels of transmissibility and severity.  Consequently, the burden of the disease may wane or dissipate such that our and other COVID-19 vaccines may be less essential from an individual and public health perspective[]."  (*Id*. at 12.)

- "We may be unsuccessful in adapting our COVID-19 vaccine or developing future versions of our COVID-19 vaccine to protect against variants of the SARS-CoV-2 virus."  (*Id*. at 10.)

- "It is [] possible that we may expend significant resources adapting our COVID-19 vaccine to protect against variants of the SARS-CoV-2 virus, but that a market for this adapted vaccine does not develop or demand does not align with our projections or cost expenditures."  (*Id*. at 10.)

### D. BioNTech and Pfizer Agree with the EC to Delay and Re-Phase Comirnaty Shipments.

By the end of January 2022, a "highly transmissible" Omicron variant had become the dominant virus strain (¶¶ 55-56), prompting the FDA to recommend that manufacturers develop a bivalent vaccine targeting both the original and Omicron strains.[5]  (¶ 86.)  While BioNTech and Pfizer worked to address that recommendation, demand for Comirnaty became more dynamic.  In the U.S., the federal government agreed in June 2022 to purchase 105 million additional Comirnaty doses with an option to purchase up to 195 million more.  (¶ 94.)  At the same time, several Eastern European countries claimed to face a unique set of challenges that altered their demand, including

---

[5] A "bivalent vaccine" is a vaccine intended to target two different strains of a virus.  (¶ 86.)

the financial strain caused by the Ukraine war and ensuing refugee crisis.  (¶¶ 69-70.)  Poland was among the first E.U. member states to voice concerns about the number of vaccines to be delivered under the EC Purchase Agreement, allegedly due to financial strain from the Ukraine war.  (¶ 69.)  In a letter to the EC president, the prime ministers of Estonia, Latvia, and Lithuania expressed similar concerns about the "budgetary implications" of the EC Purchase Agreement.  (¶ 70.)  As a result, in May 2022, BioNTech and Pfizer agreed with the EC to "rephase planned deliveries," postponing delivery of "[d]oses scheduled for delivery in June through August 2022" to "September through fourth quarter 2022."  (Ex. E at 1.)

BioNTech was transparent with investors about the effects of this amendment on vaccine demand, reporting Q2 2022 revenues of €3,196.5 million relative to €5,308.5 million in Q2 2021 (a 40% decline year over year) (Ex. F (press release) at 1), and cautioning investors that revenue "fluctuations" would persist as the "pandemic remains dynamic" (*id*. (Form 6-K) at 36).  BioNTech further warned that several other exigencies could impact future demand, including "the extent of the spread of COVID-19 infection;" "the extent to which a COVID-19 vaccine, including any booster shot, continues to be necessary beyond the current pandemic;" and the degree to which Comirnaty protected against "mutated strains" of the virus.  (*Id.* at 49.)  BioNTech also cautioned investors of "the risk of inventory write-offs or redundant production capacities" resulting from "[p]lanned new formulations of our COVID-19 vaccine" targeted at emerging variants.  (*Id.* at 81.)

### E.  BioNTech Warns of Continued Demand Fluctuation in Late 2022.

On August 31, 2022 and September 1, 2022, the FDA and EMA, respectively, authorized a bivalent Comirnaty vaccine.  (¶ 101.)  While BioNTech disclosed that, due to demand for the adapted bivalent vaccine, it expected to meet its 2022 financial guidance, it nonetheless reported progressively lower revenues from Comirnaty.  Indeed, citing "the evolving dynamics of demand" and a €138.4 million inventory write-off from, among other things, "the switch" to a bivalent

6

vaccine, BioNTech reported Q3 2022 revenue of €3,461.2 million—lower than its Q3 2021 revenue by over 40%. (Ex. G (press release) at 1, 3; *id.* (Form 6-K) at 3, 18, 27; ¶ 111.) Moreover, although BioNTech ultimately beat its 2022 guidance (*compare* Ex. C at 1 (guidance of €13-17 billion in Comirnaty revenue) *with* Ex. I at 162 (reporting €17.14 billion revenue)), the quarterly revenues that BioNTech reported throughout the Class Period, the vast majority of which were Comirnaty-derived (*e.g.*, Ex. G (Form 6-K) at 11), painted a clear picture of decreasing demand:



(*See* Ex. D at 1; Ex. F at 1; Ex. G at 1; Ex. J at 1; Ex. M at 1; Ex. P at 1.)

### F.    BioNTech Warns that 2023 Could be a "Trough Year" for Comirnaty Demand.

BioNTech remained transparent with investors about its revenue expectations in 2023. Plaintiffs misleadingly claim that, in early 2023, BioNTech failed to disclose future declines in demand while Pfizer purportedly forecast a "large write-off" during its January 31, 2023 earnings call. (*See* ¶¶ 117-18.) But Pfizer's CEO *never* stated during that call that he foresaw a large write-off. Rather, he noted that 2023 would likely be "a low point in our COVID-related revenues" due in part to "a government inventory build [of Comirnaty] that we expect to be absorbed sometime in 2023." (Ex. H at 5-6.) BioNTech echoed that view, first during its Q4 2022 earnings call when its Chief Strategy Officer stated that "2023 could be a trough year for the COVID market" (Ex. K

at 15), and again in its Form 20-F for 2022, which warned that "[d]emand for our COVID-19 vaccine, though difficult to predict, is expected to decrease in the near future," and may result in "significant inventory write-offs" that may also be caused by "[p]lanned new reformulations of [the] vaccine, including versions that could protect against new variants."  (Ex. I at 7-8, 43.)

In May 2023, Pfizer and BioNTech announced another amendment to the EC Purchase Agreement (Ex. O), which, as the EC and BioNTech contemporaneously disclosed, "rephas[ed] delivery of doses annually through 2026" to "account [for] the improved epidemiological situation" and "reduc[ed] the quantity of doses purchased by Member States," (*id*.; Ex. N).

**G.      The FDA Recommends a Monovalent Vaccine in Response to a New Variant and BioNTech Cautions Investors About the Potential Impact on Revenue.**

By June 2023, another Omicron variant, XBB.1.5, had emerged as the dominant strain of the virus.  (¶ 146.)  On June 16, 2023, the FDA recommended that manufacturers produce a monovalent formulation targeting the mutated strain.  (¶ 147.)  As BioNTech worked to develop a monovalent vaccine (¶ 148), it cautioned—as it had in the past—that:

> We [] face the risk of inventory write-offs or redundant production capacities with respect to our COVID-19 vaccine.  Planned new formulations of our COVID-19 vaccine, including versions that could protect against new variants of COVID-19 have resulted in inventory write-offs, and may lead to additional write-offs in the future . . .  Significant inventory write-offs or redundant manufacturing expenses would negatively impact our results of operations.  (Ex. P at 79-80.)

On October 13, 2023, Pfizer disclosed that it had recorded "inventory write-offs and other charges for Comirnaty of $0.9 billion" for Q3 2023.  (¶ 159.)  On October 16, 2023, in accordance with BioNTech's and Pfizer's agreement to evenly split all costs and profits in connection with the vaccine program (¶¶ 33, 35)—and consistent with the delay in reporting occasioned by BioNTech's disclosed reliance on Pfizer for sales information—BioNTech announced that it too would likely recognize up to €0.9 billion in inventory write offs and other charges related to Comirnaty. (¶ 160.)  BioNTech further disclosed that it had "been informed by Pfizer that the majority of the

write-offs relate to raw materials, mainly formulation-related lipids, purchased during the pandemic, as well as COVID-19 vaccine doses adapted to other, non-XBB.1.5 variants produced at risk." (*Id.*) That day, the price of BioNTech ADSs fell by $6.61. (¶ 164.) This lawsuit followed.

### H.    Plaintiffs' Complaint.

Plaintiffs bring this suit on behalf of a putative class of purchasers of BioNTech ADSs between March 30, 2022 and October 13, 2023 (the "Class Period"), asserting (1) a claim under Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and (2) a "control person" claim under Section 20(a) of the Exchange Act against the Individual Defendants (¶¶ 185-200). Plaintiffs allege that Defendants made false or misleading statements about: (1) the EC Purchase Agreement, including the number of doses that had been ordered or invoiced under that Contract (¶¶ 62, 64, 75, 94, 106, 121, 125, 148) and the May 2022 and May 2023 amendments thereto (¶¶ 94, 99, 121, 135, 152); and (2) BioNTech's quarterly inventory write-offs (¶¶ 66, 75, 77, 97, 108, 111, 123, 127, 137, 154) and the risk of future write-offs from the adaptation of Comirnaty to COVID-19 variants (¶¶ 139, 141, 156). These claims are fundamentally flawed.

## ARGUMENT

To avoid dismissal of a Section 10(b) and Rule 10b-5 claim, the Complaint "must plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Sing v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). The Complaint must, moreover, meet the heightened pleading standards of the PSLRA and Rule 9(b), which require Plaintiffs to state "with particularity" facts establishing that each challenged statement was materially false or misleading and facts evidencing a strong inference of scienter. *Tellabs*, 551 U.S. at 313. Plaintiffs fail to allege any actionable misrepresentation—let alone one made with scienter—and this Court should dismiss the Complaint with prejudice.

9

## I.    PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION.

The PSLRA requires Section 10(b) claims to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Rule 9(b) likewise "demands specific factual allegations demonstrating that a statement was false or misleading when made." *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 460 (2d Cir. 1999).  Falsity allegations *must also* be based on facts available at the time of the purported misrepresentation.  *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013), *aff'd*, 604 F. App'x 5 (2d Cir. 2015).  A challenge to "statement[s] believed to be true when made, but later shown to be false," *id.*, is impermissible pleading "fraud by hindsight," and constitutes grounds for dismissal, *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).

Plaintiffs do not come close to satisfying this high bar.  They frame their hindsight claims as "omissions"—that BioNTech's disclosures were misleading because they concealed declining demand and the likelihood of a significant inventory write-off.  (*E.g.*, ¶ 63.)  This is fatally flawed for two reasons.  First, Section 10(b) does not impose on speakers a duty to predict future trends or performance.  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they did do not suffice to make out a claim of securities fraud."); *Diabet v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *12 (S.D.N.Y. Sept. 19, 2024) (similar).  Yet this is precisely what Plaintiffs, who premise their case upon Defendants' alleged failure to predict both the trajectory of a global pandemic and future demand for Comirnaty, seek to impose upon Defendants here.  There is no legal basis for such a claim under established law.

10

Second, Plaintiffs' tack is a thinly veiled attempt to do what the Supreme Court prohibits: allege a Section 10(b) claim based on non-disclosure of a "known trend." *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 258 (2024). "[Section] 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011). Nor is "a corporation [] required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010). Rather, "[d]isclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, 2024 WL 2890968, at *3 (2d Cir. June 10, 2024) (quoting *Siracusano*, 563 U.S. at 44). Plaintiffs fail to plead that the challenged statements were misleading under this high standard.

### A.    None of the Challenged Statements was Materially False or Misleading.

#### 1.    Statements Concerning Vaccine Contracts with the EC.

Most of the challenged statements relate to the EC Purchase Agreement and are either (1) reports of the number of doses that had been ordered or invoiced (¶¶ 62, 64, 75, 94, 106, 121, 125, 148), or (2) general disclosures concerning the May 2022 and May 2023 amendments to the Agreement (¶¶ 94, 99, 121, 135, 152). According to Plaintiffs, these statements were false or misleading because they concealed "a massive decline in demand" for Comirnaty. (*See* ¶¶ 63, 65, 76, 95, 100, 107, 122, 126, 136, 153.) Not so.

At most, the challenged statements disclosed historical order and invoice information derived from the binding EC Purchase Agreement, and the terms of amendments thereto. (*See* ¶¶ 44, 47-48, 52.) Plaintiffs concede that these statements were factually accurate. "[A] violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021)

11

(citation omitted).[6]  Although Plaintiffs attempt to pivot by suggesting that these factually accurate statements painted an unduly rosy picture of future demand, any conclusions Plaintiffs drew about Comirnaty's future trajectory were extrapolations *they alone* made.  The law does not require issuers to guard against any and all conclusions a stockholder might independently reach where, as here, the statements did not (and could not) make precise predictions about *future* orders or *future* contract modifications.  *See Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at *16 (S.D.N.Y. Sept. 30, 2017) (no "duty to disclose" adverse facts relating to the future of a contractual relationship)*, aff'd*, 773 F. App'x 630 (2d Cir. 2019); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (no duty to disclose uncertainly around "ongoing" contractual negotiations (citation omitted)).

Nonetheless, while BioNTech could not quantify future Comirnaty demand or speculate about specific contractual changes that had yet to be negotiated, it *did* provide robust warnings that both consumer demand and the EC Purchase Agreement could change.  From the outset, Defendants warned that because they were combatting a "very unpredictable" virus in historically uncharted waters, several exigencies could cause vaccine demand to "wane or dissipate."  (Ex. B at 12; *id.* at 8, 10 ("[O]ur future revenues for our COVID-19 vaccine are uncertain" . . .  "[A] market for vaccines against [SARS-CoV-2] variants may not develop.").)  BioNTech also warned that vaccine demand may "not align with [the Company's] projections or cost expenditures" (*id.* at 10), and future revenues could be impacted by the extent of "the spread" and "mutation" the virus as well as "the extent to which a COVID-19 vaccine continues to be necessary" (*id*. at 8).

---

[6] *See, e.g.*, *Cohen v. Kitov Pharms. Holdings, Ltd*., 2018 WL 1406619, at *5 (S.D.N.Y. Mar. 20, 2018) (dismissing claim where "there was nothing inaccurate or incomplete about [defendant's] description of" FDA agreement); *Rein v. Dutch Bros, Inc*., 2024 WL 3105004, at *11 (S.D.N.Y. June 24, 2024) (dismissing claim that "accurate reports about [company's] shop openings and its price increase" in prior quarter were misleading for omitting effect of inflation on company).

As the pandemic continued, and governments completed the initial wave of vaccinations, BioNTech was transparent that demand was both dynamic and declining and, further, that its revenues were decreasing.  For example, following its May 2022 agreement with the EC to rephase vaccine deliveries to the EU member states (which it contemporaneously disclosed to investors) (Ex. E), BioNTech reported a decrease in Q2 2022 revenue from Comirnaty relative to Q2 2021 (€3,152.7 million versus €5,266 million), characterized demand as "dynamic," and *explicitly* warned that future quarterly revenue would likely "fluctuate."  (Ex. F (Form 6-K) at 10, 36, 60.) BioNTech reiterated these warnings in its Q3 2022 earnings where, once again, it disclosed lower quarterly revenue from Comirnaty relative to Q3 2021 (€3,378.1 million versus €6,021.6 million). (Ex. G (Form 6-K) at 11, 64.)[7]

That dynamism persisted into 2023, prompting BioNTech to disclose that 2023 "could be a trough year for the COVID market" as Comirnaty sales shifted to a "more commercially driven market" (Ex. K at 15), precipitating a "*decrease*" in demand "in the near future."  (Ex. I at 6 (emphasis added).)[8]  In keeping with that prediction, BioNTech issued significantly reduced 2023 guidance of €5 billion in Comirnaty revenue—almost 40% below consensus expectations and less than 30% of BioNTech's €17.1 billion Comirnaty revenue total for 2022.  (Ex. J at 2; ¶ 119.)

---

[7] The Complaint claims that two articles from early 2022 disclosed a precipitous decline in demand that BioNTech simultaneously concealed.  (¶¶ 58-59.)  But neither article supports this argument. While the February 16, 2022 Oxfam article Plaintiffs cite predicted that "the EU will have to throw away 55 million doses of COVID vaccines by the end of February," it noted that demand for vaccines remained high in Africa. *EU set to bin 25 million more vaccine doses than it has donated to Africa this year*, OXFAM INTERNATIONAL, https://www.oxfam.org/en/press-releases/eu-set-bin-25-million-more-vaccine-doses-it-has-donated-africa-year (Feb. 16, 2022) (cited ¶ 58).  The April 2, 2022 Le Monde article Plaintiffs reference blamed EU countries' destruction of excess vaccines on legal and logistical issues rather than on a glut of supply. *The huge waste of expired Covid-19 vaccines*, LE MONDE, https://www.lemonde.fr/en/science/article/2022/04/04/the-huge-waste-of-expired-covid-19-vaccines_5979632_10.html (Apr. 4, 2022) (cited ¶ 59).

[8] Plaintiffs criticize Defendants for not reporting the looming write-off Pfizer supposedly predicted in January 2023.  (¶¶ 117-18.)  But Pfizer never made that prediction.  (*Supra* at 7; *infra* at 22.)

Moreover, as it entered Q2 2023, BioNTech warned: "A re-negotiation of the existing supply contract with the European Commission is ongoing, with the potential for a rephasing of deliveries of doses across multiple years and/or *a volume reduction*." (Ex. J at 2 (emphasis added).) Two months later, BioNTech disclosed that it and Pfizer had agreed to modify the EC Purchase Agreement to reflect "an aggregate volume reduction" and a further delivery "rephasing." (Ex. N at 1.) In addition to reiterating the continued uncertainty of demand, BioNTech's Q2 2023 earnings release disclosed that quarterly Comirnaty revenue was, once again, lower than in Q2 2022 (€158.2 million versus €3,152.7 million). (Ex. P (Form 6-K) at 7, 45-46, 48.) This candor belies Plaintiffs' concealment theory. *See Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 542 (S.D.N.Y. 2023) (dismissing claim defendants concealed declining demand because they "disclose[d] . . . that the rapid increase in demand for Peloton's products could not be sustained at COVID levels" and their "public disclosures would have given the investing public the information it needed to make an informed decision about Peloton stock"); *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 489 (S.D.N.Y. 2017) ("conspicuous public disclosures of [company's] exposure" to risky assets "undermines Plaintiff's allegation that [it] failed to disclose [its] true exposure" (quotation marks omitted)).[9]

The market plainly understood BioNTech's disclosures. Indeed, a March 27, 2023 article cited in the Complaint characterized BioNTech's guidance as a "lackluster revenue prophecy" and stated that "[a]fter garnering worldwide acclaim," BioNTech was undergoing a "market metamorphosis" due to "plummeting demand," prompting the Company to warn "investors of a

---

[9] Plaintiffs claim that the disclosures were insufficient to warn of the magnitude of the declining demand disclosed in Q3 2023. (*See* ¶¶ 63, 65, 76, 95, 107, 122, 126, 149.) That is textbook fraud by hindsight. Disclosures do not become misleading simply because "less favorable results" ultimately materialize. *See Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *9 (S.D.N.Y. Mar. 15, 2022).

serious sales slowdown." *BioNTech surprises analysts with low revenue guidance as COVID-19 vaccine demand wavers*, FIERCE PHARMA, https://www.fiercepharma.com/pharma/biontechs-transitional-year-could-yield-revenue-trough-covid-shot-demand-languishes-execs (Mar. 27, 2023) (cited ¶ 129). The Financial Times reached the same conclusion, reporting that "Covid-19 vaccine maker BioNTech has forecast a sharp decline in sales, underlining the plunging demand for booster doses." (Ex. L.) It defies logic that investors were blindsided by decreasing Comirnaty demand when the market heeded BioNTech's predictions.

### 2.    Statements Concerning Inventory Write-Offs.

Plaintiffs also challenge BioNTech's reporting of its quarterly inventory write-offs (*see* ¶¶ 66, 75, 77, 97, 108, 111, 123, 127, 137, 154), arguing that its statements concealed the fact that inventory obsolescence resulting from formulation changes made "further inventory write-offs a near certainty" (*see* ¶¶ 67, 98, 128, 138, 155).[10]

Once again, Plaintiffs do not (and cannot) challenge the accuracy of BioNTech's quarterly inventory write-offs. As discussed above, a Section 10(b) claim "cannot be premised upon a company's disclosure of accurate historical data," *Danske Bank*, 11 F.4th at 99, including, as here, backwards-looking accounting disclosures and generic statements about the formulation changes that said nothing about future write-offs. *See Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.,* 2023 WL 3569068, at *11 (S.D.N.Y. May 19, 2023) (dismissing because statements about costs were "backwards looking, describing [company's] past performance with accuracy that Plaintiffs do not

---

[10] Plaintiffs also claim that BioNTech's quarterly inventory write-offs misleadingly omitted the effect declining demand for Comirnaty would have on its revenues. (*See* ¶¶ 65, 67, 78, 98, 109, 112, 124, 128, 138, 155.) This contention ignores BioNTech's disclosure that the October 2023 write-offs related to "raw materials" and "COVID-19 vaccine doses adapted to other" variants (not decreasing demand). Regardless, for the reasons explained in Section I(A)(1), *supra*, BioNTech was transparent about the potential effects of declining demand on its revenue.

challenge"); *see also Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at \*16 (S.D.N.Y. Mar. 30, 2021) ("statements that merely describe the accurate financial data using more vivid language" are not actionable). Instead, Plaintiffs suggest that because BioNTech recognized a write-off in October 2023, the statements predating that disclosure were misleading. However, disclosures "do not become misleading even if less favorable results might be predictable by the company in the future." *Insperity, Inc.*, 2022 WL 784017, at \*9.

To the extent Plaintiffs believe that BioNTech was obligated to say more about the potential magnitude of future write-offs, they are wrong. Not only was BioNTech unaware of the size of the write-off as of the date of its Q2 2023 disclosures, but BioNTech had no duty "to characterize its performance or future outlook in negative terms [or] speculate on future negative results." *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at \*4 (S.D.N.Y. May 18, 2012), *aff'd*, 507 F. App'x 81 (2d Cir. 2013); *see Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (issuer not liable for "not acknowledge[ing] the long-term unsustainability of its business model"); *In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715, at \*7 (S.D.N.Y. Nov. 10, 2020) ("A representation of historical performance need not disclose future or present performance in order to be complete and accurate regarding its purported topic").

Regardless, BioNTech repeatedly disclosed the possibility of future write-offs resulting from, among other things, vaccine reformulation. (*See, e.g.*, Ex. F at 81 ("Planned new formulations of our COVID-19 vaccine . . . may lead to additional write-offs in the future").) As the virus evolved, so did BioNTech's disclosures. For example, BioNTech's Form 20-F for 2022, filed on March 27, 2023, disclosed that BioNTech had taken a €484.6 million inventory write-off due to the switch to the Omicron bivalent vaccine. (*See* ¶ 127; Ex. I at F-52.) It also warned that the Company "face[d] the risk of inventory write-offs" from "[p]lanned new formulations of the

16

vaccine." (Ex. I at 43; *see, e.g.*, Ex. J at 2 (revenue "may be influenced by costs like inventory write-offs"); Ex. M at 40 (disclosing risk of "significant inventory write-offs").) Defendants thus disclosed the very issues Plaintiffs accuse them of concealing. *See In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *7 (S.D.N.Y. Sept. 26, 2006) (dismissing claim that company "failed to disclose the risks associated with operating in China" given "public filings disclosing that [it] was in constant danger of being harmed by government action").[11]

Cornered, Plaintiffs challenge certain of BioNTech's risk disclosures from May and August 2023 (¶¶ 139, 141, 150, 156), claiming that they misleadingly omitted that significant write-offs were "imminent," rather than possible (¶¶ 140, 142, 151, 157). As discussed in Section II, *infra*, there is not a single well-pled allegation that Defendants knew the October 2023 write-off was "inevitable." Regardless, "cautionary statements of potential risk have only rarely been found to be actionable by themselves," and "[t]hose that have been found actionable" typically "warn of a risk that has already occurred." *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *6 (S.D.N.Y. July 16, 2020). Plaintiffs proffer no basis to deviate from this rule, as the Complaint does not allege with particularity that the risks had already materialized when the warnings were made, let alone that Defendants *knew* they had materialized. *See In re Bank of Am. AIG Disclosure*

---

[11] Plaintiffs assert a related theory that BioNTech's disclosures (1) in its Form 20-F for 2021 (¶ 66) and (2) in its Form 6-K for 2Q 2023 (¶ 154) misleadingly omitted that the write-offs resulted from inventory shelf-life expiration caused by declining demand, and the vaccine formulation change, respectively (¶¶ 67, 155). But the general disclosures imparted no duty on BioNTech to volunteer additional explanation. *See Holbrook v. Trivago N.V.*, 2019 WL 948809, at *16 (S.D.N.Y. Feb. 26, 2019), *aff'd*, 796 F. App'x 31 (2d Cir. 2019). That is especially true for BioNTech's Form 6-K disclosure, given that (1) BioNTech had previously disclosed that its prior switch to the bivalent vaccine necessitated inventory write-offs (¶ 97) and (2) the FDA's June 2023 recommendation to switch to a monovalent formulation (which Plaintiffs claim led to the Q2 2023 write-off) was public (¶ 147). As such, investors easily could have "drawn their own conclusion" about the write-off. *In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at *15 (S.D.N.Y. Feb. 23, 2024). Further, as to the Form 20-F disclosure, the Complaint does not even suggest that demand declined in 2021 or otherwise caused write-offs. (*Cf.* ¶ 53 (alleging "massive" orders in 2021).)

*Sec. Litig.*, 980 F. Supp. 2d 564, 580 (S.D.N.Y. 2013) (risk warning not misleading where materialized event was "uncertain"). That is especially true here, where the risk of a write-off from the adoption of monovalent vaccine to combat the XBB.1.5 variant emerged as a material possibility following the FDA's recommendation in June 2023, *after* the May risk disclosures. (¶¶ 147-48.) Further, BioNTech could not have known the magnitude of the fiscal impact of that planned reformulation when it repeated the risk disclosures in August 2023, because it "depend[ed] on Pfizer to determine and provide estimates of the costs and profits to be shared with [BioNTech] in the countries where [Pfizer] is commercializing our COVID-19 vaccine." (Ex. B at 9.)

### B.  The PSLRA Safe Harbor for Forward-Looking Statements Protects BioNTech's Statements About Expected Dose Commitments and Demand.

Many of the alleged statements are further protected by the Reform Act's Safe Harbor, which immunizes forward-looking statements that are identified as forward-looking and "accompanied by meaningful cautionary" language. 15 U.S.C. § 78u-5(c); *see Slayton*, 604 F.3d at 766. Here, Plaintiffs challenge numerous statements made by BioNTech concerning: (1) *expected* orders for, and deliveries of, Comirnaty (¶¶ 62, 64, 94, 106, 132, 135, 148), and (2) potential *future* demand for Comirnaty (¶¶ 92, 99, 132, 135, 152). All of these statements are quintessentially forward-looking and were identified by BioNTech as such.[12] *See* 15 U.S.C. § 78u-5(i)(1) ("forward-looking statements" include (1) "plans or objectives relating to the products or services of the issuer"; (2) company's "future economic performance"; or (3) "any statement of the assumptions underlying or relating to any [such] statement[s]"); *Peloton Interactive, Inc.*, 665 F. Supp. 3d at 538 ("statements . . . regarding the future demand for its products [] fall squarely

---

[12] (*See, e.g.*, Ex. C at 8-9 (identifying statements in ¶ 62 as forward-looking); Ex. B at 4-5 (same for ¶ 64); Ex. F (press release) at 8 (same for ¶¶ 92, 94); *id.* (Form 6-K) at 117 (same for ¶ 99); Ex. G at 7 (same for ¶ 106); Ex. M (press release) at 4-5 (same for ¶ 132); *id.* (Form 6-K) at 110 (same for ¶ 135); Ex. P (press release) at 4-5 (same for ¶ 148); *id.* (Form 6-K) at 116 (same for ¶ 152).)

within [Safe Harbor]"); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 237 (S.D.N.Y. 2018) ("projections of expected sales [] are clearly forward-looking").

Moreover, the statements were each accompanied by meaningful cautionary language concerning the very risks that Plaintiffs alleged caused their losses: "declining demand for Comirnaty" and the change in vaccine formulation that "exposed the Company" to large write-offs. (*See supra* at 12-14, 16-17; *see also e.g.*, Ex. B at 10; Ex. C at 10 (incorporating risk warnings in 2021 Form 20-F); Ex. F (press release) at 1 (incorporating risk warnings in Form 6-K); *id.* (Form 6-K) at 51, 81; Ex. G (press release) at 8 (incorporating risk warnings in Form 6-K); *id.* (Form 6-K) at 55, 85; Ex. M (press release) at 6 (incorporating risk warnings in Form 6-K); *id.* (Form 6-K) at 40, 42, 73-74; Ex. P (press release) at 6; *id.* (Form 6-K) at 46, 48, 79-80.) These warnings are far more specific than those courts routinely find to constitute meaningful cautionary language. *See, e.g.*, *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 310-11 (S.D.N.Y. 2021) (warnings that company faced "supply risks" and was operating in a "rapidly changing environment" were meaningful because they "suggested to a reasonable investor that supply projections were not guaranteed"); *Peloton Interactive*, 665 F. Supp. 3d at 539 (warning that it was "uncertain how the COVID-19 pandemic will impact Subscriber renewal rates in the long-term" provided meaningful caution that changing pandemic dynamics could hamper company's growth). Accordingly, the first prong of the Safe Harbor applies to immunize Defendants' forward-looking statements.[13]

---

[13] As discussed in Section II, *infra*, the Safe Harbor also immunizes Defendants' forward-looking statements for the independent reason that they were made without "actual knowledge" that they were false or misleading. 15 U.S.C. § 78u-5(c). A number of alleged misstatements fail for other reasons as well. Sahin's comment that the Company had "further strengthened [its] COVID-19 vaccine leadership" (*see* ¶¶ 90-91) is immaterial puffery. *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 92 (S.D.N.Y. 2022). Likewise, the SOX certifications of BioNTech's Form 20-F for 2021 (*see* ¶¶ 102-03) "do not provide a stand-alone basis for liability." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 230 (S.D.N.Y. 2022) (citation omitted).

## II.    PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER.

Under the PSLRA, Plaintiffs must, "with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference" that each Defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness."  15 U.S.C. § 78u-4(b)(2)(A); *Bratusov v. Comscore, Inc.*, 2020 WL 3447989, at *7 (S.D.N.Y. June 24, 2020) (Failla, J.).[14]  For an inference to be "strong," it must be more than merely plausible or "reasonable"—it must be "cogent and at least as compelling as any opposing inference" of nonfraudulent intent based not only on the complaint, but also on "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs*, 551 U.S. at 314, 322-24; *see also ATSI Commc'ns*, 493 F.3d at 104.

While difficult to meet in all respects, Plaintiffs face an even higher burden with respect to present or historical statements, because, in the absence of actual knowledge, they must allege with specificity either that Defendants had a "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.2d 187, 198 (2d Cir. 2009); *see Bratusov*, 2020 WL 3447989, at *7.  The Complaint fails under all standards.

### A.    Plaintiffs Do Not Plead Scienter Based on Motive and Opportunity.

To plead scienter based on motive, Plaintiffs must allege particularized facts establishing a "concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  The Complaint makes no attempt to do so here. Significantly, it does not (and cannot) allege that the Individual Defendants sold ADSs during the

---

[14] When, as here, one of the defendants is a corporation, the "pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

20

Class Period—a fact that negates any inference of scienter. *See In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 463 (S.D.N.Y. 2022) (failure to allege that defendants sold ADSs during class period rebutted inference of scienter); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 420 (S.D.N.Y. 2020) (same). BioNTech also repurchased its ADSs during the Class period (*see* Ex. G (press release) at 6), further undermining any such inference. *See In re Tibco Software, Inc.*, 2006 WL 146965, at *21 (N.D. Cal. May 25, 2006) (it makes "no sense to [re]purchase [] stock if defendants knew the prices to be inflated" (citation omitted)).

### B. Plaintiffs Fail to Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

Having failed to plead a fraudulent motive, Plaintiffs must plead "correspondingly greater" "circumstantial evidence of conscious misbehavior or recklessness." *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. FXCM, Inc.*, 767 F. App'x 139, 141 (2d Cir. 2019). This requires detailed allegations "that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their [allegedly] misleading statements." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphasis in original); *see Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010). Ignoring BioNTech's robust risk disclosures—which *rebut* fraudulent intent—the Complaint resorts to speculation, hearsay, and mischaracterization, none of which is availing.

***Joint Committees.*** Plaintiffs wrongly suggest that BioNTech's participation in the joint committees established under the Collaboration Agreement means that Defendants must have known about Pfizer's October 2023 write-off before its disclosure. (¶ 170.) Plaintiffs' claim that the joint committees provided a real-time conduit for inventory-related information in Pfizer's possession is pure speculation. Absent from the Complaint are any particularized allegations about

specific committee meetings: no dates, no information about discussions that transpired, and no mention of documents presented.  Nor does the Complaint specify what the BioNTech committee members (let alone the Individual Defendants) were purportedly told and when.  Thus, Plaintiffs' suggestion that the Collaboration Agreement gave BioNTech real time insight into Pfizer's data regarding the performance of Comirnaty is "unsubstantiated" and thus, impermissible, speculation. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006) ("[A]llegations that Defendants received weekly reports on revenue amount[ed] to unsubstantiated speculation").[15]  Accordingly, the allegation fails under the PSLRA.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 249 (S.D.N.Y. 2012) ("'where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information'" (citation omitted)).

**Statement By Pfizer's CEO.**  No less than five times, the Complaint claims that, on January 31, 2023, Pfizer CEO Albert Bourla disclosed that Pfizer "expected a massive write-off sometime in 2023 due to excessive inventory held by governments" and criticizes Defendants for not making a similar disclosure.  (¶¶ 9, 117, 142, 157, 171.)  That claim is disingenuous.  Bourla did not state that he expected a "massive write-off."  He stated that Pfizer anticipated a "drop" in Comirnaty vaccines due to "fewer primary vaccinations" and "a government inventory build that we expect to be absorbed sometime in 2023" when Comirnaty would be sold "through commercial channels." (¶¶ 9, 117; *supra* at 7-8.)  Shortly thereafter, BioNTech reported that its outlook was "consistent

---

[15] Plaintiffs also point to the "proximity" of Defendants' forward looking revenue guidance in August 2023 to their disclosure of a write-off in October 2023.  (¶ 174.)  Such proximity does not support an inference of scienter.  *See Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015) ("close temporal proximity between defendants' positive statements in August of 2013 and their recording of a sizable charge against inventory in September of 2013" was "too ephemeral . . . to raise a strong inference of scienter"), *aff'd*, 660 F. App'x 23 (2d Cir. 2016).

with what Pfizer has disclosed [in January]." (Ex. K at 15.)  Defendants' reiteration of Bourla's statement thus rebuts an inference that they concealed waning vaccine demand.  *See In re AT&T/DirecTV Now Sec. Litig.*, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) (defendant's statement concerning expected subscriber growth was "consistent with what [other executive] said a month later" and thus undermined scienter), *aff'd*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022).

*Confidential Witness Statements.*    Plaintiffs' reliance on statements by a single "confidential witness" ("CW") is equally deficient.  The CW, a "vaccine and health specialist" at *Pfizer*, not BioNTech, claims that he observed "a steep decline in demand from [U.S.] consumers for the Comirnaty vaccine" based on an anecdotal recollection that doctors "had started pushing that task towards retail[] pharmacies." (¶ 84.)  A shift in *vaccine providers* in one geography, however, is not the same as a shift in global *vaccine demand*. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *14 (S.D.N.Y. Apr. 2, 2020) (CW allegations concerning "operational issues" did not contradict statement that company was "on track" to meet goals).  More importantly, the CW allegations (like Plaintiffs' other scienter allegations) fail to specify, as they must, what information Sahin and Holstein possessed that contradicted their public statements. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016) (dismissing complaint that did "not plausibly allege[] that [] management had knowledge" of decreased revenue growth); *see also Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013).  Accordingly, the CW's non-specific observations fail under the PSLRA. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (CWs worked for different company and "plaintiffs make no allegation that those sources ever had any contact with" defendants).

*Eastern Europe.*   Although Plaintiffs point to concerns voiced by a number of Eastern European states about the EC Purchase Agreement in 2022, that "pushback" was not indicative of

future demand or even current demand elsewhere in the world. The concerns were allegedly precipitated by a specific—and unique—problem: the financial fallout of the Ukrainian war and the ensuing refugee crisis. (*See, e.g.*, ¶ 69.) Plaintiffs do not (and cannot) allege why BioNTech would have viewed changing demand in these states as a litmus test for global demand, especially when the contemporaneous data showed that BioNTech was accurately forecasting demand—that is, beating its 2022 guidance despite re-phasing shipments to the EC in response to the Baltic states' concerns. (*See supra* at 6-7); *Pearlstein*, 93 F. Supp. 3d at 245 (plaintiff failed to "allege that there was a recognizable trend" of lowered product demand).[16]

***Corporate Seniority and Core Operations***. Plaintiffs' remaining scienter arguments ask the Court to infer scienter from the Individual Defendants' senior positions at BioNTech (¶ 173) and Comirnaty's "core" value to BioNTech's business (¶ 172). Corporate seniority, standing alone, has no bearing on scienter. *Plumbers & Steamfitters Loc. 773 Pension Fund*, 694 F. Supp. 2d at 300; *see Schiro v. Cemex*, 396 F. Supp. 3d 283, 307-08 (S.D.N.Y. 2019).[17] "Core operations" is an equally disfavored pleading tactic in this Circuit. *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 398 (S.D.N.Y. 2022). Regardless, judgment-oriented accounting determinations such as whether,

---

[16] Eastern Europe experienced uniquely high levels of vaccine hesitancy or refusal. Dimiter Toshkov, *What Accounts for the Variation in COVID-19 Vaccine Hesitancy in Eastern, Southern, and Western Europe?*, INSTITUTE OF PUBLIC ADMINISTRATION, LEIDEN UNIVERSITY, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10070781/#:~:text=1%3A%20in%20Eastern%20Europe%2C%20levels,is%20support%20for%20compulsory%20vaccination (May 11, 2023). For this additional reason, the region was unique and not indicative of a global trend in demand.

[17] Moreover, the knowledge Plaintiffs seek to impute was held by Pfizer, where neither Sahin nor Holstein worked. To overcome this deficiency, Plaintiffs claim that Sahin was "laser focus[ed] on manufacturing details" because of his purported observation in 2020 that the "Collaboration team" was "overfilling" Comirnaty vials. (¶ 171.) But such a pre-Class Period statement has no bearing here. *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *16 (S.D.N.Y. Sep. 28, 2012) (rejecting pre-class period scienter allegations as too far removed); *City of Brockton Ret. Sys. v. Shaw Grp.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) ("It is not enough . . . to allege that, because executives like the Individual Defendants were 'closely involved' in [the] business, one can strongly infer that they 'were furnished with financial data which contained the errors . . .'" (citation omitted)).

when, and how much of a write-off to take, are not "core" to BioNTech, and are not the sort of "operations" that could contribute to any inference of scienter. *See Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at \*31 (C.D. Cal. Apr. 14, 2015) (collecting cases); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005).

### C.     The Most Compelling Inference from the Facts Alleged is Non-Fraudulent.

Viewed holistically, Plaintiffs' "theory" of scienter pales in comparison to the far more cogent and compelling inference that Defendants did not commit fraud.  Although BioNTech expressed genuine optimism about Comirnaty, it tempered expectations with robust disclosures about the likelihood of fluctuating demand, the concomitant risks to its business, and the possibility of write-offs from vaccine adaptations.  The Company's sizeable reinvestment in itself, combined with the fact that neither Individual Defendant is alleged to have sold stock, supports the inference that Defendants were realistic about the Company's prospects and transparent with investors about the risks posed by a dynamic and unprecedented global crisis.  *See In re AT&T/DirectTV Now Sec. Litig.*, 2020 WL 4909718, at \*15 ("Th[e] circumstantial evidence [] is not as compelling as the obvious, non-culpable explanation.").[18]

### III.    PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM.

Because Plaintiffs' Section 10(b) claim fails, their secondary Section 20(a) claim also fails. *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004).

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[18] Plaintiffs' claim should independently be dismissed because they fail to plead loss causation, which "requires [them] to show that [their] investments would not have lost value if the facts that defendants misrepresented or omitted had been known." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 282-83 (S.D.N.Y. 2006).  Here, the "true facts"—*i.e.*, declining demand for Comirnaty and the possibility of future write-offs—were already known to the market. (*Supra* at § I(A)); *see Lentell v. Merrill Lynch & Co., Inc.*, 396 F.2d 161, 176-77 (2d Cir. 2005) (no loss causation because "high-risk nature of the investment . . . was available to the marketplace").

Date: November 18, 2024

**KATTEN MUCHIN ROSENMAN LLP**

_/s/___Bruce G. Vanyo_____
Bruce G. Vanyo
bruce@katten.com
Jonathan Rotenberg
jrotenberg@katten.com
Sarah Eichenberger
sarah.eichenberger@katten.com
50 Rockefeller Plaza
New York, New York 10020
Telephone: (212) 940-8800

_Attorneys for Defendants_

26

# APPENDIX

## Alleged Misstatements in the Amended Complaint
## And Summary of Reasons They Are Not Actionable[1]

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 1 | 62 | <u>Q4 2021 Earnings Release on Mar. 30, 2022 (Ex. C at 3-4)</u><br><br>As of the beginning of March 2022, BioNTech and Pfizer delivered more than 3.1 billion doses of BNT162b2 to more than 170 countries and regions around the world. By early March 2022 … approximately 1.3 billion doses had been delivered to low- and middle-income countries. As of mid-March 2022, BioNTech and Pfizer have signed orders for approximately 2.4 billion doses in 2022. Further discussions for additional dose commitments are ongoing for 2022 and beyond.<br><br>• BioNTech and Pfizer launched a new product formulation of their COVID-19 vaccine that simplifies vaccine handling and has improved storage and transport conditions …  To date, this formulation has been delivered to more than 50 countries.<br><br>• In December 2021, BioNTech and Pfizer announced an agreement with the European Commission (EC) and its member states, pursuant to which the EC exercised its option to purchase more than 200 million additional doses of vaccine. The 200 million doses are in addition to the 450 million doses already planned to be delivered in 2022, based on an agreement signed in May 2021. ***The number of doses to be delivered to EC member states in 2022 will now total more than 650 million doses. In sum, the total number of potential doses delivered to the EC, inclusive of all agreements, is expected to be up to 2.4 billion by end of 2023.*** | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |

---

[1] References to "Ex." are to exhibits to the Declaration of Sarah Eichenberger, dated November 18, 2024.  References to "Mot." are to Defendants' Memorandum of Law in support of their Motion to Dismiss.  In addition to the reasons listed in this chart, each alleged misstatement is also not actionable because Plaintiffs fail to plead scienter and loss causation.  (Mot. at § II.)

[2] Emphasis has been added to certain text herein only to match the emphasis placed on that same text in the Amended Complaint (Dkt. 40).

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 2 | 64 | Annal Report for 2021 on Form 20-F, filed on Mar. 30, 2022 (Ex. B at 89)<br><br>**As of mid March 2022, we and our partner Pfizer have signed orders for approximately 2.4 billion doses to be delivered in 2022.** This includes agreements with the governments in the United States, United Kingdom, Japan, Canada and the European Union. **Further discussions for additional dose commitments are ongoing and the order book is expected to further grow.** Based on our order book and the expected continued need for booster vaccinations and vaccinations in the pediatric population, we and Pfizer are well positioned to continue to be a global leader in vaccines for the prevention of COVID-19.<br><br>We and Pfizer have an agreement with the European Commission, or the EC, that includes supplying 600 million doses of our COVID-19 vaccine to the 27 EU member states by the end of 2021, and to supply 900 million doses in 2022 and 2023, with option to request up to an additional 900 million doses. **This would also cover potential vaccines adapted to variants without additional costs, if a variant vaccine is determined to be needed and subsequently authorized or approved . . . In December 2021, we and Pfizer announced an agreement with the EC and its member states, pursuant to which the EC exercised its option to purchase more than 200 million additional doses of vaccine. The 200 million doses are in addition to the 450 million doses already planned to be delivered in 2022, based on an agreement signed in May 2021. The number of doses to be delivered to EC member states in 2022 will now total more than 650 million doses. In sum, the total number of potential doses delivered to the EC, inclusive of all agreements, is expected to be up to 2.4 billion by end of 2023.** | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |
| 3 | 66 | Annual Report for 2021 on Form 20-F, filed on Mar. 30, 2022 (Ex. B at F-54)<br><br>During the year ended December 31, 2021, inventory write-offs and reserves related to our COVID-19 vaccine amounting to €194.6 million were recognized in cost of sales as a result of the respective inventories not fulfilling the predefined quality-specifications (GMP) and / or regulatory requirements (approval of the respective authorities, i.e. FDA) and / or shelf-life expiration, compared to nil in the previous period . . . During the years ended December 31, 2021 and 2020, €1,255.1 million and €32.1 million, respectively costs of inventories were recognized as cost of sales. | Not false or misleading when made. (Mot. at § I(A)(2).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 4 | 75 | Q1 2022 Earnings Release on May 9, 2022 (Ex. D at 3-4)<br><br>Cost of sales was €1,294.1 million for the three months ended March 31, 2022, compared to €233.1 million for the comparative prior year period . . . This increase in cost of sales is [parti]ally attributed to expenses arising from inventory write-offs and for production capacities derived from contracts with Contract Manufacturing Organizations.<br><br>In the first quarter of 2022, BioNTech and Pfizer have invoiced approximately 750 million COVID-19 vaccine doses . . . As of end-April 2022, the Companies have signed orders for approximately 2.4 billion doses in 2022. | Not false or misleading when made. (Mot. at § I(A)(1)-(2).) |
| 5 | 77 | Form 6-K, attaching quarterly report for Q1 2022, filed on May 9, 2022<br><br>[D]uring the three months ended March 31, 2022 and 2021, inventory write-offs and reserves related to our COVID-19 vaccine amount[ed] to €156.0 million and nil, respectively, and were recognized in cost of sales as a result of the introduction of a new COVID-19 vaccine formulation. | Not false or misleading when made. (Mot. at § I(A)(2).) |
| 6 | 90 | Q2 2022 Earnings Release on Aug. 8, 2022 (Ex. F at 1)<br><br>In the first half of 2022, we achieved important milestones as we have further strengthened our COVID-19 vaccine leadership and have expanded our broad pipeline and accelerated its maturation. Our COVID-19 product pipeline includes variant-adapted and next-generation vaccine candidates, aimed at prolonged and broad protection[.] | Includes statement of corporate optimism or puffery. (Mot. at 20 n.13.) |
| 7 | 92 | Q2 2022 Earnings Release on Aug. 8, 2022 (Ex. F at 1)<br><br>With our initiatives around variant-adapted COVID-19 vaccine candidates, we expect an uptake in demand in our key markets in the fourth quarter of 2022, subject to regulatory approval. | Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 8 | 94 | Q2 2022 Earnings Release on Aug. 8, 2022 (Ex. F at 3)<br><br>As of the beginning of July 2022, BioNTech and Pfizer have delivered in total more than 3.6 billion doses to 180 countries or territories. ***The companies have signed orders for approximately 2.5 billion doses for 2022***, and, in the first half of the year, invoiced approximately 1.2 billion doses.  The cumulative share of doses[] increased in the period between January 1, 2022 to July 20, 2022 from approximately 52% to 63% in all markets[]. In developed markets[], the share of doses for the same time period increased from approximately 59% to 68%.<br><br>• ***In May 2022, BioNTech and Pfizer announced an agreement with the European Commission, or EC, to amend their originally agreed contractual delivery schedules for the COVID-19 vaccine.  The amendment rephases planned deliveries to help support the EC and Member States' ongoing immunization programs … Doses scheduled for delivery in June through August 2022 will now be delivered in September through to the fourth quarter of 2022. This change of delivery schedule did not impact the companies' full-year 2022 revenue guidance or the full-year commitment of doses to be delivered to EC Member States in 2022.***<br><br>• In June 2022, BioNTech and Pfizer entered into a new vaccine supply agreement with the U.S. government. Under the terms of the agreement, the U.S. government will receive 105 million doses . . . potentially including the Omicron-adapted adult vaccine, subject to granting of U.S. FDA Emergency Use Authorization, or EUA.  The U.S. government also has the option to purchase up to an additional 195 million doses, bringing the potential total to 300 million vaccine doses. Delivery of the vaccine doses is scheduled to begin in late summer 2022 and will continue into the fourth quarter of this year.  The U.S. government will pay the two companies $3.2 billion after receiving the first 105 million doses of vaccine. | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 9 | 97 | Form 6-K, attaching quarterly report for Q2 2022, filed on Aug. 8, 2022 (Ex. F at 16, 20)<br><br>During three and six months ended June 30, 2022, inventory write-offs and reserves related to our COVID-19 vaccine amounting to €247.1 million and €403.1 million, respectively, were recognized in cost of sales as a result of the planned introduction of a new COVID-19 vaccine formulation and the potential switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine. During the comparative periods, three and six months ended June 30, 2021 no inventory write-offs were recorded.<br><br>As of June 30, 2022, our current provisions include €207.8 million (nil as of December 31, 2021) of obligations for production capacities derived from contracts with Contract Manufacturing Organizations, or CMOs, that became redundant as a direct result of the planned introduction of a new COVID-19 vaccine formulation, the potential switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine and due to increased internal manufacturing capacities during the three and six months ended June 30, 2022.  The related expenses were recognized in cost of sales in our unaudited interim condensed consolidated statements of profit or loss. | Not false or misleading when made. (Mot. at § I(A)(2).) |
| 10 | 99 | Form 6-K, attaching quarterly report for Q2 2022, filed on Aug. 8, 2022 (Ex. F at 36)<br><br>We believe the development of the pandemic remains dynamic which influences the potential switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine, subject to regulatory approval, thereby causing a re-phasing of orders from those made earlier in the year to a later time in the year.  These developments are leading to fluctuations in quarterly revenues which we expect to remain over the rest of the financial year with an uptake in demand in our key markets in the fourth quarter of 2022 related to the Omicron-adapted bivalent vaccine, subject to regulatory approval. | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |
| 11 | 102 | Amended Annual Report for 2021 on Form 20-F/A, filed on Oct. 26, 2022<br><br>Certifications pursuant to the Sarbanes-Oxley Act of 2002 | No standalone basis for liability.  (Mot. at 20 n.3.) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 12 | 106 | Q3 2022 Earnings Release on Nov. 7, 2022 (Ex. G at 3)<br><br>Following regulatory approvals, BioNTech and Pfizer immediately began shipping Original/Omicron BA.1 and BA.4/BA.5-adapted bivalent COVID-19 vaccines in September 2022 in time for fall and winter booster campaigns.  Shipments in the United States began approximately two months after the [FDA] provided its guidance for the BA.4/BA.5-adapted bivalent COVID-19 vaccine.<br><br>As of mid-October 2022, BioNTech and Pfizer have invoiced approximately 300 million doses of Original/Omicron-adapted bivalent vaccine . . .<br><br>***BioNTech expects to invoice up to 2.1 billion doses of the COVID-19 vaccine in 2022. Some dose deliveries have been shifted into 2023 due to the evolving dynamics of demand.*** | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |
| 13 | 108 | Q3 2022 Earnings Release on Nov. 7, 2022 (Ex. G at 1-2)<br><br>Cost of sales were €752.8 million for the three months ended September 30, 2022 (Q3 2021: €1,211.4 million) . . . . ***[C]ost of sales were [partially] impacted by expenses arising from inventory write-offs and expenses for production capacities derived from contracts with contract manufacturing organizations.*** | Not false or misleading when made. (Mot. at § I(A)(2).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 14 | 111 | Form 6-K, attaching quarterly report for Q3 2022, filed on Nov. 7, 2022 (Ex. G at 18, 21)<br><br>During three and nine months ended September 30, 2022, inventory write-offs and reserves related to our COVID-19 vaccine amounting to €138.4 million and €559.4 million, respectively, were recognized in cost of sales due to the switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine and further raw materials reserves. During the comparative periods, three and nine months ended September 30, 2021, inventory write-offs amounting to €88.0 million and €107.8 million, respectively, were recognized in cost of sales . . .<br><br>As of September 30, 2022, our current provisions include €321.2 million (nil as of December 31, 2021) of obligations for production capacities derived from contracts with Contract Manufacturing Organizations, or CMOs, that became redundant as a direct result of the introduction of a new COVID-19 vaccine formulation, the switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine and due to increased internal manufacturing capacities during the three and nine months ended September 30, 2022. The related expenses were recognized in cost of sales in our unaudited interim condensed consolidated statements of profit or loss. | Not false or misleading when made. (Mot. at § I(A)(2).) |
| 15 | 121 | Q4 and Full Year 2022 Earnings Release on Mar. 27, 2023 (Ex. J at 1-2)<br><br>In December 2022, BioNTech and Pfizer announced that approximately 2 billion doses of COMIRNATY were invoiced globally in 2022 between the two companies, including approximately 550 million doses of the Original/Omicron BA.4-5-adapted bivalent COVID-19 vaccine, as of mid-December 2022.<br><br>In January 2023, BioNTech and Pfizer announced that negotiations were ongoing for the re-phasing of delivery timelines for the COMIRNATY supply agreement with the European Commission (EC). The agreement with the EC was signed in May 2021 and a rephasing agreement was previously reached in May 2022. | Not false or misleading when made. (Mot. at § I(A)(1).) |

A-8

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 16 | 123 | <u>Q4 and Full Year 2022 Earnings Release on Mar. 27, 2023 (Ex. J at 1)</u><br><br>Cost of sales were €183.5 million for the three months ended December 31, 2022, compared to €583.2 million for the comparative prior year period.  For the year ended December 31, 2022, cost of sales were €2,995.0 million, compared to €2,911.5 million for the comparative prior year period. Cost of sales were impacted by expenses arising from inventory write-offs and expenses for production capacities derived from agreements with contract manufacturing organizations that became redundant.  In addition, during the three months ended December 31, 2022, cost of sales were impacted by the release of provisions. | Not false or misleading when made.  (Mot. at § I(A)(2).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 17 | 125 | <u>Annual Report for 2022 on Form 20-F, filed on Mar. 27, 2023</u> (Ex. I at 85)<br><br>In 2022, we and Pfizer continued our global COVID-19 vaccine leadership with the first-to-market Original/Omicron BA.4-5-adapted bivalent COVID-19 vaccine directed against both the original COVID-19 virus and the Omicron BA.4-5 adapted COVID-19 virus. We now have three commercial COVID-19 vaccine products on the market: the original COVID-19 vaccine, and two Original/Omicron-adapted bivalent vaccines: Original/BA.1- and Original/Omicron BA.4-5-adapted bivalent vaccines, which are all referred to as *Comirnaty*.<br><br>In 2022, together with Pfizer, we invoiced approximately two billion doses of Comirnaty. As part of our and Pfizer's two-billion-doses pledge to support equitable access to medicines, we and Pfizer have delivered approximately 1.7 billion doses of *Comirnaty* to low- and middle-income countries in line with demand.<br><br>In June 2022, Pfizer entered into a new vaccine supply agreement with the U.S. government. Under the terms of the agreement, the U.S. government received 105 million doses . . . including the Original/Omicron BA.4-5-adapted bivalent COVID-19 vaccine for adults. The U.S. government also has the option to purchase up to an additional 195 million doses, bringing the potential total to 300 million vaccine doses. Delivery of the vaccine doses began in late summer 2022. The U.S. government was contractually required to pay the two companies $3.2 billion after receiving the first 105 million doses of vaccine.<br><br>***In September 2022, following regulatory approvals, we and Pfizer began shipping Original/Omicron BA.1- and BA.4-5-adapted bivalent COVID-19 vaccines in time for fall and winter booster campaigns. Shipments to the U.S. began approximately two months after the FDA provided its guidance for the Original/Omicron BA.4-5-adapted bivalent COVID-19 vaccines. As of mid-December 2022, we and Pfizer have shipped approximately 550 million doses of Original/Omicron-adapted bivalent vaccine.*** | Not false or misleading when made.  (Mot. at § I(A)(1).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 18 | 127 | <u>Annual Report for 2022 on Form 20-F, filed on Mar. 27, 2023 (Ex. I at 163)</u><br><br>From the year ended December 31, 2021 to the year ended December 31, 2022, cost of sales increased by €83.5 million or 3% from €2,911.5 million to €2,995.0 million . . . . [C]ost of sales was [partially] impacted by expenses arising from inventory write-offs and expenses for production capacities derived from contracts with Contract Manufacturing Organizations, or CMOs, that became redundant.  The effects were driven by the introduction of a new COVID-19 vaccine formulation, the switch from the monovalent vaccine to our Omicron-adapted bivalent COVID-19 vaccines and due to accelerating internal manufacturing capacities during the year ended December 31, 2022.<br><br>***During the year ended December 31, 2022, inventory write-offs to net realizable value and reserves related to our COVID-19 vaccine amounting to €484.6 million were recognized in cost of sales due to the switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine and further raw materials reserves recognized with respect to our excess stock***, compared to €194.6 million in the previous period.  The inventories valued at net realizable value in our consolidated statements of financial position as of December 31, 2022, consider contractual compensation payments . . . .  During the years ended December 31, 2022, and 2021, costs of inventories in the amount of €1,550.6 million and €1,255.1 million, respectively, were recognized as cost of sales. | Not false or misleading when made.  (Mot. at § I(A)(2).) |
| 19 | 132 | <u>Q1 2023 Earnings Release on May 8, 2023 (Ex. M at 2)</u><br><br>[E]stimated BioNTech COVID-19 vaccine revenues reflect expected deliveries under existing or committed supply contracts and anticipated sales through traditional commercial orders.  A re-negotiation of the existing supply contract with the European Commission is ongoing, with the potential for a rephasing of deliveries of doses across multiple years and/or a volume reduction.  While a ***vaccine adaptation is expected to lead to increased demand***, fewer primary vaccinations and lowered population-wide levels of boosting are anticipated. Seasonal demand is assumed, moving expect d revenue generation significantly to the second half of the year 2023. | Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 20 | 135 | <u>Form 6-K, attaching quarterly report for Q1 2023, filed on May 8, 2023 (Ex. M at 21)</u><br><br>We expect that as SARS-CoV-2 continues to evolve, and the risk of severe COVID-19 disease and deaths continues especially for high risk populations, there will be continued demand for vaccine boosting and vaccinations, especially for at-risk and immunocompromised groups. To meet this need, in 2023, we plan to deliver doses originally scheduled for delivery in 2022 in some geographies. We also expect that in 2023, the transition from an advanced purchase agreement environment to commercial market ordering will start in some geographies and that there may be a regulatory recommendation to adapt the COVID-19 vaccines to address newly circulating variants or sublineages of SARS-CoV-2. Our estimated COVID-19 vaccine revenues reflect expected deliveries under existing or committed supply contracts and anticipated sales through traditional commercial orders. ***A re-negotiation of the existing supply contract with the European Commission is ongoing, with the potential for rephasing deliveries of doses across multiple years and/or a volume reduction.*** | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |
| 21 | 137 | <u>Form 6-K, attaching quarterly report for Q1 2023, filed on May 8, 2023 (Ex. M at 14)</u><br><br>During the three months ended March 31, 2023 and 2022 expenses from inventory write-downs to net realizable value and inventory write-offs due to inventories expected to be unsaleable, not fulfilling the specification defined by our quality standards, shelf-life expiry or disposals resulted in €73.7 million and €156.0 million, respectively, included in cost of sales. | Not false or misleading when made. (Mot. at § I(A)(2).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 22 | 139 | <u>Form 6-K, attaching quarterly report for Q1 2023, filed on May 8, 2023 (Ex. M at 40-41)</u><br><br>We cannot accurately predict the revenues our COVID-19 vaccine will generate in future periods or for how long our COVID-19 vaccine will continue to generate material revenues and we cannot ensure it will maintain its competitive position.  Uncertainty in the demand for our COVID-19 vaccine and difficulties in targeting appropriate supply of our COVID-19 vaccines have in the past resulted, and *may* in the future result, in significant inventory write-offs and cancellations of contract manufacturing orders.  Our business and financial condition *could* be materially affected by lowered COVID-19 vaccine revenues resulting from any of the above factors, or by production and supply chain difficulties.  In addition, *if* our revenues or market share of, or other financial metrics relating to our COVID-19 vaccine do not meet the expectations of investors or securities analysts, the market price of the ADSs representing our ordinary shares may decline. | Not false or misleading when made.  (Mot. at § I(A)(2).) |
| 23 | 141 | <u>Form 6-K, attaching quarterly report for Q1 2023, filed on May 8, 2023 (Ex. M at 73-74)</u><br><br>***Our inability to manufacture sufficient or appropriate quantities of our COVID-19 vaccine or any of our product candidates, or our failure to comply with applicable regulatory requirements, could materially and adversely affect our business*** (emphasis in original).<br><br>We also face the risk of inventory write-offs or redundant production capacities with respect to our COVID-19 vaccine.  ***Planned new formulations of our COVID-19 vaccine, including versions that could protect against new variants of COVID-19, have resulted or may result in significant research and development expense that was not or may not be recouped. In addition, we have experienced in the past, and may experience in the future, redundant production capacities under our agreements with CMOs due to planned new formulations, adaptations of our COVID-19 vaccine and increased internal manufacturing capacities.***  Significant inventory write-offs or redundant manufacturing expenses would negatively impact our results of operations. | Not false or misleading when made.  (Mot. at § I(A)(2).) |

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|---|---|---|
| 24 | 148 | <u>Q2 2023 Earnings Release on Aug. 7, 2023 (Ex. P at 1)</u><br><br>• Preparation for launch of Omicron XBB.1.5-adapted monovalent COVID-19 vaccine as recommended by the U.S. Food and Drug Administration (FDA), European Medicines Agency (EMA) and other health authorities; deliveries expected to start as early as September, subject to regulatory approval<br>• Reiterates COVID-19 vaccine revenue guidance of approximately €5 billion in 2023 | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |
| 25 | 150 | <u>Q2 2023 Earnings Release on Aug. 7, 2023 (Ex. P at 2)</u><br><br>This estimate reflects expected revenues related to BioNTech's share of gross profit from COVID-19 vaccine sales in the collaboration partners' territories . . . which **may** be influenced by costs such as inventory write-offs once materialized and shared with the collaboration partner Pfizer. | Not false or misleading when made. (Mot. at § I(A)(2).) |
| 26 | 152 | <u>Form 6-K, attaching quarterly report for Q2 2023, filed on Aug. 7, 2023 (Ex. P at 23)</u><br><br>In May 2023, we and Pfizer announced an agreement had been reached with the European Commission, or the EC, to amend the previous COVID-19 Vaccine Purchase Agreement to deliver COVID-19 vaccines to the European Union, or the EU. The amended agreement reflects ours and Pfizer's commitment to working collaboratively to help address ongoing public health needs, while respecting the principles of the original agreement. The agreement rephased delivery of doses annually through 2026. In addition, the agreement includes an aggregate volume reduction, providing additional flexibility for EU Member States. The EC will maintain access to future adapted COVID-19 vaccines and the ability to donate doses, in alignment with the original agreement.<br><br>We expect that as SARS-CoV-2 continues to evolve, and the risk of severe COVID-19 disease and deaths continues, especially for high risk populations, there will be continued demand for vaccine boosting and vaccinations, especially for at-risk and immunocompromised groups. We also expect to begin the transition from an advanced purchase agreement environment to commercial market ordering in some geographies, driven by regulatory recommendations to adapt COVID-19 vaccines to newly circulating variants or sublineages of SARS-CoV-2, namely XBB.1.5 for the fall and winter seasons in 2023 and 2024. | Not false or misleading when made. (Mot. at § I(A)(1).)<br><br>Includes forward-looking statements protected by the PSLRA Safe Harbor (Mot. at § I(B).) |

A-13

| # | AC ¶ | Alleged Misstatement[2] | Reason(s) Why Statement is Not Actionable |
|---|------|-------------------------|--------------------------------------------|
| 27 | 154 | <u>Form 6-K, attaching quarterly report for Q2 2023, filed on Aug. 7, 2023</u> (Ex. P at 14)<br><br>During the three and six months ended June 30, 2023 expenses from inventory write-downs to net realizable value and inventory write-offs due to inventories expected to be unsaleable, not fulfilling the specification defined by our quality standards, shelf-life expiry or disposals resulted in €40.2 million and €113.9 million, respectively, included in cost of sales. (€247.1 million and €403.1 million with respect to write-offs during the three and six months ended June 30, 2022). | Not false or misleading when made. (Mot. at § I(A)(2).) |
| 28 | 156 | <u>Form 6-K, attaching quarterly report for Q2 2023, filed on Aug. 7, 2023</u> (Ex. P at 79-80)<br><br>***Our inability to manufacture sufficient or appropriate quantities of our COVID-19 vaccine or any of our product candidates, or our failure to comply with applicable regulatory requirements, could materially and adversely affect our business*** (emphasis in original).<br><br>We also face the risk of inventory write-offs or redundant production capacities with respect to our COVID-19 vaccine. ***Planned new formulations of our COVID-19 vaccine, including versions that could protect against new variants of COVID-19, have resulted or may result in significant research and development expense that was not or may not be recouped. In addition, we have experienced in the past, and may experience in the future, redundant production capacities under our agreements with CMOs due to planned new formulations, adaptations of our COVID-19 vaccine and increased internal manufacturing capacities.*** Significant inventory write-offs or redundant manufacturing expenses would negatively impact our results of operations. | Not false or misleading when made. (Mot. at § I(A)(2).) |

A-14