UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIANO LADEWIG, Individually and on behalf of All Others Similarly Situated,<br><br>                 Plaintiff,<br><br>   v.<br><br>BIONTECH SE, UĞUR ŞAHIN, and JENS HOLSTEIN,<br><br>                 Defendants. | Case No.: 1:24-cv-05310-KPF |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, N.Y. 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

Joshua B. Silverman
Brian P. O'Connell
POMERANTZ LLP
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
Fax: (312) 377-1184
Email: jbsilverman@pomlaw.com
Email: boconnell@pomlaw.com

*Counsel for Additional Plaintiff*
*and Additional Counsel for the Class*

Dated: January 17, 2025

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND FACTS ................................................................................... 4

      A.    BioNTech Develops Comirnaty with Pfizer. ........................................... 4

      B.    Demand for Comirnaty Peaks Then Falls. ............................................... 4

      C.    Defendants Mislead Investors about Demand, Backlog, and Revenue. ................ 6

      D.    BioNTech Misses Earnings Targets and Writes Off €0.9 Billion in
            Comirnaty Inventory. ............................................................................. 8

III.  LEGAL STANDARD ...................................................................................... 10

IV.   ARGUMENT .................................................................................................. 11

      A.    Defendants Misrepresented the Demand for Comirnaty and Concealed
            Known Inventory Risks. ......................................................................... 11

      B.    Plaintiffs Adequately Plead a Strong Inference of Scienter. ................... 17

      C.    Şahin and Holstein Are Liable as a "Control Person" under Section 20(a). ......... 23

V.    CONCLUSION ............................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
 529 F. Supp. 3d 111 (S.D.N.Y. 2021) ....................................................................... 20

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
 19 F.4th 145 (2d Cir. 2021) ............................................................................... 1, 22

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)........................................................................................... 10

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007) ................................................................................ 11

*In re Avon Sec. Litig.*,
 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019)..................................... 20

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.,*
 763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................. 16

*Bell Atl. Corp. v. Twombly*,
 127 S. Ct. 1955 (2007)................................................................................. 10, 11

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
 556 F. Supp. 3d 100 (D. Conn. 2021)................................................................. 20

*Caiola v. Citibank, N.A.*,
 295 F.3d 312 (2d Cir. 2002) ............................................................................ 3, 13

*Christine Asia Co. v. Yun Ma*,
 718 F. App'x 20 (2d Cir. 2017) .......................................................................... 18

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
 No. 17 Civ. 0917 (LGS), 2018 U.S. Dist. LEXIS 45676 (S.D.N.Y. Mar. 20, 2018) ............... 14

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
 22 F.4th 1 (1st Cir. 2021).................................................................................. 21

*Employees' Ret. Sys. v. Blanford*,
 794 F.3d 297 (2d Cir. 2015) .............................................................................. 17

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000) ............................................................................ 9, 11

*Gauquie v. Albany Molecular Rsch., Inc.*,
   No. 14 CV 6637 (FB) (SMG), 2016 U.S. Dist. LEXIS 97295 (E.D.N.Y. July 26, 2016)........ 20

*In re GE Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................................................. 21

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) ................................................................................................ 12

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008) .................................................................................. 18

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   607 F. Supp. 3d 381 (S.D.N.Y. 2022) .................................................................................. 18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ................................................................................................ 23

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)............................................................................................................... 10

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................................. 20

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
   900 F.2d 576 (2d Cir. 1990) ............................................................................................ 2, 13

*Meyer v. JinkoSolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ...................................................................................... 3, 13, 14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................................................ 15

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................................... 12, 19

*Pearlstein v. BlackBerry Ltd.*,
   93 F. Supp. 3d 233 (S.D.N.Y. 2015) .................................................................................... 21

*Plumber & Steamfitters Local 773 Pension Fund, Bos. Ret. Sys. v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) .................................................................................................. 13

*Rein v. Dutch Bros., Inc.*,
   No. 23 Civ. 1794 (PAE), 2024 U.S. Dist. LEXIS 113203 (S.D.N.Y. June 24, 2024)............. 14

*Robeco Cap. Growth Funds Sicav â Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*,
    665 F. Supp. 3d 522 (S.D.N.Y. 2023) ....................................................................... 15

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ...................................................................................... 21

*San Antonio Fire & Pension Fund v. Dentsply Sirona Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024) ................................................................ 12, 20

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................ 18, 22

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
    968 F.3d 204 (2d Cir. 2020) .............................................................................. 13, 17

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ........................................................................ 11

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS 199809 (S.D.N.Y. Nov. 26, 2018) .............. 22

*Skiadas v. Acer Therapeutics Inc.*,
    No. 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814 (S.D.N.Y. June 16, 2020) ............. 20

*Stadium Capital LLC v. Co-Diagnostics, Inc.*,
    No. 22-cv-6978 (AS), 2024 U.S. Dist. LEXIS 19754 (S.D.N.Y. Feb. 5, 2024)..... 12, 16, 19, 23

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ...................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................ 11, 17, 22

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...................................................................... 11

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .................................................................................... 16

*Yannes v. SCWorx Corp.*,
    No. 20-cv-03349 (JGK), 2021 U.S. Dist. LEXIS 116330 (S.D.N.Y. June 21, 2021) .............. 20

**Statutes**

15 U.S.C. §78u-4 ........................................................................................................... 1

## I.    **<u>INTRODUCTION</u>**

Lead Plaintiff Docdeer Foundation and additional named plaintiff Xia Rongpeng (collectively, "Plaintiffs") allege violations under the Securities Exchange Act of 1934 as modified by the Private Securities Litigation Reform Act of 1995. 15 U.S.C. §78u-4 ("PSLRA").[1] While the PSLRA carries special pleading standards for fraud claims, these standards are not meant to create a near-impossible hurdle for plaintiffs to overcome, as Defendants would lead this Court to believe. The PSLRA does not turn the motion to dismiss into a trial by papers. All factual allegations in the complaint are still required to be accepted as true and common-sense inferences should not be disregarded. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021) (emphasizing that courts "must be careful not to mistake heightened pleading standards for impossible ones"). With that, it takes little to see that Plaintiffs have adequately stated a claim for relief under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5(b).

BioNTech SE ("BioNTech" or the "Company") developed one of the first vaccines for Covid-19 at the outset of the pandemic, Comirnaty. In late-2020, both the U.S. Food and Drug Administration ("FDA") and the European Medicines Agency ("EMA") approved its use to treat Covid-19 in the United States and Europe. BioNTech enjoyed record-breaking earnings the following year as countries worldwide ordered billions of vaccine doses. BioNTech closely tracked orders and routinely told investors how many doses it would deliver in 2022 and 2023. For the better part of the Class Period, this figure remained at or around 2.4 billion doses, signaling to investors that the market for Comirnaty was strong and still in demand across the globe.

---

[1] All capitalized terms not otherwise defined herein have the same meanings set forth and defined in the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (Dkt. No. 40).  Citations to "¶__" refer to the numbered paragraphs of the Complaint.

This was not true, however. Beginning in early-2022, countries around Europe began rejecting deliveries and cancelling orders as public sentiment towards vaccination changed. It started with Romania's refusal to accept 28 million vaccine doses and soon spread to numerous other countries, such as Poland, Slovenia, Portugal, the Czech Republic, and even Germany (where BioNTech is based). Problems for BioNTech worsened as regulatory agencies started requiring vaccines capable of treating different Covid-19 variants, rendering inventory targeting the old variants obsolete. By mid-2023, about a dozen different European countries had cancelled orders or refused to accept deliveries for hundreds of millions of doses worth billions in revenue.

Despite the severe drop-off in demand for Comirnaty, BioNTech continued to recklessly tout the number of doses it had sold as if the cancellations never happened. This misinformation had the desired effect of fostering investor demand. Plaintiffs and other investors who purchased stock during the Class Period paid artificially inflated prices due to the misconception that Comirnaty was still in high demand and BioNTech was on track to achieve another record-breaking year of earnings. Investors ultimately learned the truth on October 16, 2023, when BioNTech announced it would likely write off €900 million of inventory related to Comirnaty. From intra-Class Period highs of more than $180/ADS, BioNTech's price fell to below $100/ADS resulting in market capitalization losses of more than a billion dollars.

Defendants offer a handful of reasons why they should not even be subject to discovery for their securities fraud. None has merit. First and foremost, they argue that their statements concerning the number of doses sold and/or scheduled for delivery were true at the time the statements were made. Literal truth, however, is not a defense to securities fraud. *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (disclosures required under the securities laws are "measured not by literal truth," but based on whether they "would have mislead

a reasonable investor"). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Thus, by opting to promote the Company based on the number of orders it received and/or would ship before year-end, BioNTech and its executives were obligated to disclose that many of its orders had been cancelled or were facing an acute risk of not being accepted at delivery.

Defendants also argue that despite their central roles at the Company, they had no way of knowing BioNTech would ultimately write-down its inventory. While Plaintiffs' allegations show otherwise, the claims alleged hinge on concealment of waning demand and obsolete inventory, not the prediction of a write-down. Following a string of order cancellations from multiple European countries, regulators began calling for new vaccine formulas capable of targeting multiple variants and sublineages of the Covid-19 virus. While Comirnaty was initially in high demand, it quickly became obsolete and unwanted. Inventory accumulated without any reasonable means of clearing it, and there is no plausible basis to infer that the inventory and obsolescence were not known to Defendants; indeed, Defendants' statements during the Class Period show they were intimately familiar with the vaccine demands and regulatory requirements concerning new variants. They knew the product was faltering and outdated inventory had become unusable, making the likelihood of a write-down all but guaranteed. Defendants' refusal to acknowledge these known risks is not a defense to liability and cannot immunize them as a matter of law.

Plaintiffs and other similarly situated investors sustained significant damages because of Defendants' false statements and material misrepresentations during the Class Period. Defendants should be held accountable for their actions. For the reasons stated below, Defendants' motion to dismiss should be denied in its entirety.

II.    **BACKGROUND FACTS**

A.    **BioNTech Develops Comirnaty with Pfizer.**

BioNTech joined forces with Pfizer in April 2020. ¶¶2, 32. Under the terms of their Collaboration Agreement, the two companies researched, developed, and commercialized the Comirnaty vaccine for Covid-19. ¶33. Pfizer led clinical development in the United States, while BioNTech led development in Europe. ¶34. BioNTech and Pfizer evenly split costs and revenues relating to the vaccine. ¶¶33, 35.

The Collaboration Agreement also established a series of committees to oversee all material aspects of Comirnaty's development and commercialization. These committees included: (i) a Joint Steering Committee to oversee Comirnaty's development that was chaired by a BioNTech representative and met regularly (weekly and then bi-weekly) on a continuing basis (¶¶36-38); (ii) a Joint Commercialization Committee to oversee pricing and marketing that consisted of joint chairpersons from BioNTech and Pfizer (¶¶39-40); and (iii) a Joint Finance Committee consisting of representatives from both companies to set financial forecasting and budgeting (¶41). Importantly, these committees were tasked with determining ***and notifying BioNTech*** and Pfizer if earnings, sales, and supplies deviated from forecasts. ¶¶40-41.

B.    **Demand for Comirnaty Peaks Then Falls.**

In December 2020, the FDA and EMA authorized Comirnaty as a Covid-19 vaccine. ¶¶2, 45. By February 2021, BioNTech and Pfizer had over 300 million doses ordered from the United States and 500 million doses from the European Commission, amounting to approximately €13.1 billion in revenue. ¶¶46-47. These amounts increased over the course of the year: in May 2021, the European Commission announced an additional contract to purchase up to 1.8 billion doses totaling €35.1 billion (¶¶48, 52); in July 2021, the United States agreed to purchase another 200

4

million doses for approximately €4 billion (¶50); and in October 2021, the United States agreed to purchase an additional 50 million doses for approximately €1 billion (¶50). BioNTech and Pfizer also received orders from other countries around the world, including 149 million doses from the United Kingdom, 85 million doses from Australia, and 194 million doses from Japan. ¶53.

While BioNTech was quick to announce these immense government purchase orders, it did not disclose the enormous decline in demand as the 2021 vaccine season ended. ¶54. A majority of adults had already been vaccinated by the end of 2021, and booster shots proved less popular than the initial vaccine. ¶¶51, 54. In fact, by March 2022, 84% of adults in the United States had been vaccinated, but only a little more than half had even a single booster dose. ¶54. Similarly, approximately 73% of adults in the European Union had been vaccinated with only about 55% receiving a booster shot. ¶54. Demand for Comirnaty decreased even further as the Omicron variant rose in prevalence towards the end of 2021. ¶¶55-56. The lower risk of hospitalization with Omicron led many to forego the vaccine in light of the perceived lack of severity. ¶55.

By February 2022, a month before the Class Period, BioNTech was already facing dwindling demand and mounting surpluses amongst its purchasers. ¶¶4, 58. On February 16, 2022, Oxfam International, a global nonprofit organization, stated that the European Union would "have to throw away 55 million doses" of Covid-19 vaccine by the end of February 2022. ¶58. This was only the tip of the iceberg. As reported by *Le Monde* on April 4, 2022, "[m]ore than 240 million doses of Covid vaccines [had] passed their expiration dates" with approximately 73% of the then-expired doses being Comirnaty. ¶59. Countries soon began rejecting deliveries despite pre-existing purchase orders, with the first being Romania, which refused to accept shipment of 28 million doses worth over €550 million. ¶60.

C.       **Defendants Mislead Investors about Demand, Backlog, and Revenue.**

BioNTech's public statements at this point in time concealed the known and growing difficulties. They made no mention of the evaporating demand or growing stockpiles of expiring vaccine doses or inventory targeting older variants. Although a write-off of inventory was unquestionably imminent, Defendants carried on as if demand was still as strong as ever and BioNTech was on track for another record-breaking year. For example, on March 30, 2022, the start of the Class Period, BioNTech told investors that "[t]he number of doses to be delivered to EC [European Commission] member states in 2022 will now total more than 650 million doses. In sum, the total number of potential doses delivered to the EC . . . is expected to be up to 2.4 billion by end of 2023." ¶62. The 2.4 billion figure, however, included doses already rejected, such as the 28 million by Romania. ¶63. In truth, BioNTech expected to deliver much fewer doses in 2022 and 2023 because demand for Comirnaty had rapidly decreased after the initial vaccine shots. ¶63. BioNTech included similar statements in its filings with the SEC, which likewise inflated the number of doses it would deliver and the demand that existed. ¶¶64-67.

Market conditions continued to worsen. On April 6, 2022, the FDA's Vaccine and Related Biologic Products Advisory Committee convened an open meeting to discuss Covid-19 vaccine efforts. ¶68. The Committee emphasized its preference for a single vaccine that could treat different variants and subvariants, which Comirnaty at the time could not do and therefore placed it at further risk of obsolescence. ¶68; *see also* ¶86 (June 2022 recommendation from FDA to develop bivalent vaccine). Later that month, Poland stopped taking deliveries of the vaccine. ¶69. On April 29, 2022, Estonia, Latvia, and Lithuania told the European Commission that their existing supplies of Covid-19 vaccines were going to waste due to low demand. ¶70. These countries further noted that the vaccines, including Comirnaty from BioNTech, were being delivered with

6

half their shelf lives already depleted, and asked for manufacturers' assistance to avoid "huge wastage of vaccines." ¶¶71-72. On May 2, 2022, *Al Jazeera* reported that Denmark had decided to discard 1.1 million excess vaccines "because their expiration date [was] near, and efforts to donate them to developing countries [had] failed." ¶73. The article quoted Danish officials stating that, "Denmark, like many countries around the world, ha[d] a surplus of vaccines" and that "supply of vaccines exceed[ed] the demand." ¶74.

Yet BioNTech's statements to investors falsely portrayed continued strong demand. On May 9, 2022, Defendants reported their first-quarter earnings and once again touted that BioNTech had "signed orders for approximately 2.4 billion doses in 2022." ¶75. Defendants' statements were categorically positive without any mention of the order rejection, expiring inventory, and demand cliff problems that then existed and were known by Defendants. ¶76; *see also* ¶¶77-78.

The supply-demand imbalance Defendants hid from investors worsened further as 2022 progressed. On May 20, 2022, *Politico* reported that European Union member states were pressuring the European Commission to renegotiate their purchase orders for Comirnaty, citing the 55 million doses already discarded by February 2022, reduction in vaccination campaigns, and improving pandemic situation. ¶79. In early-June 2022, Poland, Bulgaria, Croatia, Estonia, Hungary, Latvia, Lithuania, and Romania collectively called for a "reduction" of vaccine orders. ¶79. On June 13, 2022, the Employment, Social Policy Health and Consumer Affairs Council of the European Union ("EPSCO") held a meeting to discuss the surplus of vaccines being shipped by BioNTech. ¶80. Representatives of Poland, Slovenia, Portugal, the Czech Republic, and Germany demanded that "revision of the contracts [was] essential" to avoid "financial mismanagement" and "spend[ing] public funds on activities that do not bring benefits to public health." ¶¶81-83.

7

Demand for Comirnaty in the United States was also declining. In addition to shifting sentiment towards vaccination amongst patient populations, doctors were experiencing vaccine fatigue. ¶84. Vaccine inventories were increasingly going bad due to expiration. ¶84. Booster shots were also unpopular with patients. ¶85. Sales representatives at BioNTech partner Pfizer reported the declining demand internally, which was then shared with BioNTech through Joint Commercialization Committee meetings and communications. ¶85; *see also* ¶¶36-41 (describing joint committees organized under the Collaboration Agreement).

**D.      BioNTech Misses Earnings Targets and Writes Off €0.9 Billion in Comirnaty Inventory.**

BioNTech's public statements did not mention the declining demand or looming inventory write-offs until August 8, 2022. On that day, BioNTech reported its earnings for the second quarter of 2022. Cracks in Defendants' messaging to investors began to emerge when they reported revenue nearly €1 billion below consensus estimates. ¶87. Defendants attributed the enormous miss to the "dynamic" development of the pandemic and a "re-phasing of orders" which led to "fluctuations in quarterly revenues." ¶87. This disclosure crushed BioNTech's stock price, which quickly dropped about 7.5% (a statistically significant amount) as investors and analysts started to question Defendants' prior statements about the strength of demand for Comirnaty. ¶¶88-89.

To stem this decline, Defendants falsely reassured investors by making bold but untrue statements about new demand for their Covid-19 vaccines in "key markets." ¶¶90, 92. Defendants also reiterated and emphasized to investors that they had "signed orders for approximately 2.5 billion doses for 2022," although they knew that number had already been eroded by rejections and excess supply, and said that recent changes in delivery schedules "did not impact the companies' full-year 2022 revenue guidance or the full-year commitment of doses to be delivered to EC [European Commission] Member States in 2022." ¶94. These statements, similar to earlier

Class Period misrepresentations, were materially misleading as they continued to conceal the severe drop-off in demand for Comirnaty and increasing cancellations from multiple European countries. ¶¶91, 93, 95.

Defendants' misleading messaging continued over the remainder of the Class Period. Publicly, they told investors that demand was strong, deliveries were continuing, and orders remained unchanged. *See*, *e.g.*, ¶¶105-06 (third quarter earnings announcement). Internally, the picture was dramatically different. Numerous European countries had renegotiated and/or cancelled their orders, including but not limited to Romania, Poland, Denmark, and Germany, while others had altogether stopped taking deliveries, such as Czech Republic and Hungary. *See*, *e.g.*, ¶¶107, 113-15 (describing inventory build-up of unused doses throughout Europe). Even as its partner Pfizer disclosed a government inventory buildup that its CEO Albert Bourla "expect[ed] to be absorbed some time in 2023," BioNTech said nothing of its own inventory buildup risks or impending write-off. ¶¶117-18.[2]

Defendants were ultimately unable to maintain the illusion of growing (or even stable) demand. On March 27, 2023, while reporting BioNTech's fourth quarter and full-year earnings for 2022, Defendants guided to €5 billion in vaccine revenue for the remainder of 2023, significantly below analyst estimates of €8 billion. ¶118. Articles started to emerge reporting on the changing demand for Comirnaty in Europe and the destruction of millions of unused doses. ¶¶129-31, 143.

---

[2] Defendants proffer an unsupported interpretation of Pfizer's statement in this regard. Defs. Br. at 22. The parties' disagreement between the meaning of Pfizer's statements about its future write-off is a factual dispute not appropriate at this stage in the litigation, when all inferences must be made in Plaintiffs' favor. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). In any event, the inventory build-up was described in the past tense, not from commercial channels expected in the future: "In 2022, we sold at pandemic prices more doses than were eventually used. This resulted in a government inventory build up that we expect to be absorbed sometime in 2023"—the inventory buildup was not due to commercial channels. *See* Defs.' Ex. H. Discovery will show Plaintiffs' interpretation of the statement, not Defendants', was correct.

Demand for Comirnaty only worsened as regulators, including the FDA and EMA, began adopting recommendations for new vaccines targeting new variants and sublineages. ¶¶145-47. Shockingly, during this time, Defendants continued to tell investors that BioNTech was expecting "***increased demand***" for its vaccines while at the same time concealing known obsolescence and dose expiration, customer rejections, European surpluses, and low booster take-up, all of which created an acute risk of a massive inventory write-off for existing doses. *See, e.g.*, ¶¶132, 148-51.

On October 16, 2023, BioNTech finally announced the inventory write-off that it spent the Class Period trying to avoid, recognizing a charge of up to €900 million. ¶160. Defendants explained that the write-off was being taken in conjunction with Pfizer's announcement of a similar write-off stemming from raw materials (which it knew to target prior variants and therefore to be obsolete) and excess inventory. *See* ¶¶159, 162-63. BioNTech's stock price dropped precipitously in response to the disclosure, falling over 6% in the span of just one day. ¶164. From intra-Class Period highs of more than $180/ADS, BioNTech's price fell to below $100/ADS at the end of the Class Period and has not recovered since. *See* ¶¶17, 164. Plaintiffs and other shareholders who invested during the Class Period have sustained significant damages because of Defendants' false and materially misleading statements. ¶¶165-66.

## III.    **LEGAL STANDARD**

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a 12(b)(6) motion, a court must accept all well-pled factual

10

allegations as true, draw all reasonable inferences in the plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007). A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Twombly,* 550 U.S. at 545. When evaluating the complaint, the court must "draw[] all reasonable inferences in the plaintiff's favor." *Ganino*, 228 F.3d at 161. The allegations in the complaint, along with the inferences drawn therefrom, need only "'raise a right to relief above the speculative level.'" *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555 ). "Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*.

## IV.    ARGUMENT

### A.    Defendants Misrepresented the Demand for Comirnaty and Concealed Known Inventory Risks.

Under Rule 9(b) and the PSLRA, a plaintiff must specify the alleged statements, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003). To do this, a plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). The Complaint readily satisfies this standard.

Defendants materially misrepresented the then-existing demand for Comirnaty during the Class Period by providing investors with a misleading account of the doses that had been ordered and scheduled for delivery. In truth, many of the 2.4 billion doses Defendants repeatedly trumpeted to investors had been cancelled or refused ahead of shipment. *Compare*, *e.g.*, ¶62 (providing public with number of doses in press release) *with* ¶63 (alleging backlogged orders had been cancelled).

11

The discrepancy between BioNTech's announced orders and cancelled shipments grew more extreme as the Class Period went on and additional European countries refused to accept deliveries. Indeed, by the last half of the Class Period, over ten different European countries had cancelled their orders or refused to accept additional shipments of Comirnaty doses. *See*, *e.g.*, ¶¶106-07 (contrasting BioNTech's representation concerning 2.1 billion doses to be invoiced in 2022 out of 2.4 billion doses total backlog with cancellations from Romania, Poland, Estonia, Latvia, Lithuania, Denmark, Germany, etc.). They hid from investors that known changes in vaccine formulation rendered finished inventory and precursors targeting prior variants obsolete. *See*, *e.g.*, ¶¶146-47.

Similar falsity allegations have been upheld in numerous cases in which demand for a product has declined or was artificially inflated. *See*, *e.g.*, *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021) (reversing dismissal where defendants misled investors by discussing "high sales volume" while omitting "unsustainable channel stuffing incentives"); *San Antonio Fire & Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 316 (S.D.N.Y. 2024) ("It would be misleading if (as alleged) the company was having trouble getting the materials to make the products, many of the products it did make didn't work, and much of its sales were due to channel stuffing."); *Stadium Capital LLC v. Co-Diagnostics, Inc.*, No. 22-cv-6978 (AS), 2024 U.S. Dist. LEXIS 19754, at *10-11 (S.D.N.Y. Feb. 5, 2024) (plaintiff "plausibly alleges" that "something was up (or down, rather) with demand," thereby demonstrating material contradiction between public statements and internal information). "[E]ven if literally true," demand statements can be misleading where they omit, as here, that reported figures "reflected excessive 'sales' into channel inventory." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019).

Defendants continued their misrepresentations throughout the Class Period, perpetuating the false impression that demand for Comirnaty remained strong and that BioNTech had 2.4 billion doses in its revenue pipeline, with 2.1 billion to be invoiced in 2022. *See*, *e.g.*, ¶106. Similarly, Defendants concealed from investors the larger and more severe impact of these cancellations—a massive inventory write-off. *See*, *e.g.*, ¶¶125-26, 156-57 (discussing new formulations of vaccine while omitting need to write-off existing but obsolete inventory). By reiterating the same backlog and 2022 invoice guidance while omitting the known impact of multiple European delivery refusals, order cancellations, and regulatory determinations that the formulations comprising existing inventory were outdated and needed to be replaced, Defendants portrayed a misleading impression of demand that did not align with existing facts. *See McMahan*, 900 F.2d at 579 (disclosures required under the securities laws are "measured not by literal truth," but based on whether they "would have mislead a reasonable investor"). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250; *see also Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020). By putting such statements " 'in play,' Defendants were required to speak accurately and completely." *Id.* Defendants failed in this regard.

Defendants miss the mark when attempting to portray these reports as mere accurate historical sales information. Defs. Br. at 11-12. They are wrong—the statements characterize then-present orders, backlog and demand that were simply false when made. Thus, this case bears no resemblance to Defendants' cited cases. For example, in *Danske Bank*, the court explained that the defendants' failure to disclose anti-money laundering issues did not automatically render their financial statements false or misleading. *Plumber & Steamfitters Local 773 Pension Fund, Bos. Ret. Sys. v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021). Plaintiffs here make no such

inferential leap. Defendants spoke directly about Comirnaty orders while possessing material information contradicting their statements, *i.e.*, that orders and deliveries were being cancelled. *Kitov Pharmaceuticals* and *Dutch Brothers* are inapposite for the same reason. There, the connection between the adverse information and public statements was "too attenuated" whereas here the information and statements are closely linked. *See Cohen v. Kitov Pharms. Holdings, Ltd.*, No. 17 Civ. 0917 (LGS), 2018 U.S. Dist. LEXIS 45676, at *13-14 (S.D.N.Y. Mar. 20, 2018) (omissions not actionable because they did not pertain to study's findings); *Rein v. Dutch Bros., Inc.*, No. 23 Civ. 1794 (PAE), 2024 U.S. Dist. LEXIS 113203, at *28 (S.D.N.Y. June 24, 2024) (statements about "shop openings" did not trigger additional disclosure on "inflation").

Defendants' arguments regarding so-called "robust warnings" is equally misplaced. Defs. Br. at 12-14. None of Defendants' so-called warnings explained the orders and cancellations already known, the inventory nearing expiration, and the vast amounts of inventory made obsolete by new formulation requirements. If anything, the so-called warnings exacerbated Defendants' false statements because they falsely characterized the risks as hypothetical when they had already came to fruition. Investors relied on Defendants' public statements about BioNTech's orders and deliveries for Comirnaty; if that information was truly unpredictable (as Defendants now claim in their brief), then they should have admitted so during the Class Period. Having chosen to tout high order and delivery figures to investors, Defendants had "a duty to tell the whole truth." *Meyer*, 761 F.3d at 250. Defendants cannot insulate themselves with hypothetical disclosures of risks that have already begun to materialize. *See*, *e.g.*, *id.* at 251 ("Although this statement warned of a financial risk to the company from environmental violations, the failure to disclose then-ongoing and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk"); *Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005)

14

("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) (rejecting "boilerplate disclosures" because "generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks").

Defendants' cited cases do not remotely support their concealment from investors. For example, the defendants in *Peloton* "explicitly told the public that demand for Peloton's products would be returning to pre-COVID levels after the surge in demand it had seen during COVID . . . rather than promising that the unprecedented demand that Peloton had seen during COVID closures would remain at the same level." *Robeco Cap. Growth Funds Sicav â Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 541 (S.D.N.Y. 2023). Defendants made no such disclaimers here but instead repeatedly affirmed the invoicing, ordering, and delivery schedule for billions of doses of Comirnaty even though multiple European countries had already cancelled the orders. Thus, *Peloton* actually illustrates how BioNTech's disclosures were misleading.

Defendants' straw argument about predicting a negative future event is equally meritless. Defs. Br. at 15-17. While the frequency and severity of cancellations together with known obsolescence of inventory all but guaranteed an immense write-off, Plaintiffs' claims are not based on a failure of prediction. Similar to the plaintiffs in *Novak v. Kasaks*, Plaintiffs contend that "[h]ad [BioNTech] taken appropriate write-downs, they argue, the Company's earnings would have been substantially lower than reported. Thus, [Defendants'] alleged deception painted too rosy a picture of the Company's current performance and future prospects and kept the company's stock price at an artificially high level during the Class Period." *Novak v. Kasaks*, 216 F.3d 300, 304 (2d Cir. 2000). Indeed, Plaintiffs "provide[] specific facts concerning the Company's significant write-off

of inventory directly following the Class Period, which tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made." *Id*. at 312-13. These facts—which include a string of order cancellations combined with regulatory efforts to develop new vaccines capable of treating different variants—constituted the proverbial "writing on the wall" concerning the inventory write-down. Defendants cannot avoid liability simply because they covered their eyes and refused to moderate their statements to investors when demand worsened.

Defendants raise one final misplaced argument concerning the PSLRA's safe harbor for forward-looking statements, claiming generally that "many" statements are protected from liability. Defs. Br. at 18-19. But the alleged false statements are not "forward-looking." *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) ("at least some of the statements that Vivendi identifies as forward-looking contain present representations"). They concern omission of then-known impediments, including that many European countries making up the billions of doses supposedly sold had either already cancelled their orders or had refused to accept delivery, and that regulators had already required formulation changes rendering much inventory obsolete. Such statements, made with regard to current demand when "the company was 'already seeing a decline in customer orders' would all be interpreted as describing present conditions." *Stadium Capital*, 2024 U.S. Dist. LEXIS 19754, at *13-14. Consequently, any cautionary language accompanying the false statements was not "meaningful," as required. *See In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.,* 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("To be 'meaningful,' a cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deceptions drops to nil'" and even "warnings of specific risks . . . do

16

not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described") (collecting cases).

**B.        Plaintiffs Adequately Plead a Strong Inference of Scienter.**

The pleading requirements for scienter, while elevated, do not require a smoking gun and are easily satisfied here. A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 311, 315. Courts must conduct the scienter analysis "holistically" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs,* 551 U.S. at 322-23 (2007). "In this Circuit, plaintiffs can satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer*, 968 F.3d 204 at 212. Scienter is alleged if a "reasonable person would deem the inference of scienter…at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324-26. The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences;" rather, the inference of scienter need only be ***equally plausible*** as any non-culpable inference. *Id*. at 324. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

Plaintiffs allege five compelling pieces of circumstantial evidence of conscious misbehavior or recklessness. *See Employees' Ret. Sys. v. Blanford,* 794 F.3d 297, 306 (2d Cir. 2015) (scienter shown, *inter alia*, where defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."). These include Defendants' actual knowledge of the adverse information, their willingness to hold themselves out as knowledge about the adverse information, the fact that

17

Comirnaty was of paramount importance to BioNTech, the temporal proximity and severity of the inventory write-off, and, finally, Defendants' admissions concerning their conduct. These points give rise to a strong, compelling and cogent inference of scienter, as illustrated below.

Defendants had actual knowledge of the omitted information. Where a plaintiff alleges defendants "had knowledge of facts . . . that explicitly contradicted their public statements . . . [t]hese allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008); *see also* ¶173 (BioNTech website identifying Şahin and Holstein as initiating and overseeing Comirnaty). Defendants knew demand for Comirnaty had cratered because multiple European countries had refused to accept further deliveries and/or cancelled their existing orders. *See*, *e.g.*, ¶¶113-15. Romania was first to refuse orders starting as early as February 2022. ¶60. Cancellations only increased from there. *See* ¶¶80-83 (contract renegotiations from Germany, Czech Republic and other European countries); ¶¶113-14 (describing EPSCO conference in late-2022 where multiple countries demanded renegotiation of contracts); ¶131 (letter from Poland on behalf of several other European countries in mid-2023 describing further shipments as "utterly pointless"). The directive from regulators to switch formulations further supports scienter because it provided actual knowledge that the outdated inventory was obsolete and could not be used. *See*, *e.g.*, *Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 22-23 (2d Cir. 2017) (scienter where executives met with government officials and discussed relevant information); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("access to non-public information contradicting" statements supports scienter); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 397-98 (S.D.N.Y. 2022) ("[W]arnings from" regulators are "widely recognized to be evidence of scienter.").

18

Defendants also knew that the excess Comirnaty inventory had turned obsolete due to the emergence of new Covid-19 variants. Given the Collaboration Agreement's mandated close working relationship between Pfizer and the BioNTech through the Joint Finance Committee, Joint Steering Committee, and Joint Commercialization Committee, the Individual Defendants had the same information as Pfizer and its CEO Bourla, which led to Pfizer's acknowledgment of a massive write-off no later than January 2023. ¶171. The Individual Defendants understood that BioNTech needed to take that same write-off that Bourla recognized on January 31, 2023, when he addressed the government inventory build-up that had occurred in 2022 due to sales of doses exceeding doses actually used. ¶¶117, 171.

Nor is Defendants' culpability immunized because the order backlog at one time might have been accurate. *See Stadium Capital*, 2024 U.S. Dist. LEXIS 19754, at *18-19 (scienter pleaded where defendants had knowledge that demand had declined, even though such decline did not directly contradict the misleading statements). *Lexmark International* is instructive. There, the court held that statements were misleading, "even if literally true," for omitting "that revenue reports reflected excessive 'sales' into channel inventory." 367 F. Supp. 3d at 31. Scienter was pleaded because defendants "had information belying the accuracy of their public statements" about inventory levels. *Id.* at 37. Defendants here similarly possessed the knowledge that rendered their public statements misleading, as demonstrated by their respective roles under the terms of the Collaboration Agreement with Pfizer, their responsibility for leading the joint venture's European sales, and involvement in the regulatory proceedings that rendered existing formulations obsolete. *See* ¶¶34-41, 116, 146-48, 170-71.

Defendants induced reliance by portraying themselves as knowledgeable about Comirnaty orders and inventory. Investors are entitled to assume that executives are informed about the topics

19

on which they publicly speak. *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (scienter where defendant "held himself [out] to the public as intimately knowledgeable"); *accord In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010). Where, as here, Defendants hold themselves out as having knowledge on a misrepresented topic, scienter is readily found. *Yannes v. SCWorx Corp.*, No. 20-cv-03349 (JGK), 2021 U.S. Dist. LEXIS 116330, at *17 (S.D.N.Y. June 21, 2021); *Dentsply Sirona*, 732 F. Supp. 3d at 318-19. By repeatedly communicating about Comirnaty orders and inventory, Defendants signaled to investors that they had informed themselves of the truth. "Actively communicating with the public about [these issues] demonstrates defendants' sensitivity to it." *Gauquie v. Albany Molecular Rsch., Inc.*, No. 14 CV 6637 (FB) (SMG), 2016 U.S. Dist. LEXIS 97295, at *6 (E.D.N.Y. July 26, 2016); *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 133-34 (D. Conn. 2021).

Comirnaty was critical to BioNTech's operations and earnings. The fact that Comirnaty was BioNTech's principal product all but guarantees Defendants' knowledge of the alleged omitted information. *See* ¶172 (Comirnaty accounted for over 99% of BioNTech's revenue). "Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 174 (S.D.N.Y. 2021). Here, Comirnaty's success was the "sin[e] qua non" behind BioNTech's ability to succeed. *See Skiadas v. Acer Therapeutics Inc.*, No. 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814, at *32 (S.D.N.Y. June 16, 2020); *In re Avon Sec. Litig.*, No. 19-cv-01420 (CM), 2019 U.S. Dist. LEXIS 200816, at *62 (S.D.N.Y. Nov. 18, 2019) (scienter adequately pleaded where "it would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market"); *In re GE*

20

*Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (applying core operations where "GE Capital provided 50% of GE's revenues"); *see also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021) ("defendants 'must have known that [product] was not functional,' because the product's professed importance to the company strongly implied that senior officers at the company were following it closely and thus were aware of its failings"). Thus, knowledge of the omitted information that renders the statements misleading suffices.

BioNTech recognized a €900 million write-off within weeks of making false statements. The Company's failure to disclose the possibility of €900 million write-off as it was observing declining vaccine demand and advocating for formula changes that would render existing inventory obsolete further enhances the inference of scienter. ¶174; *see also In re Pareteum Sec. Litig.*, No. 19 Civ. 9767 (AKH), 2021 U.S. Dist. LEXIS 151106, at *48 (S.D.N.Y. Aug. 11, 2021) ("The proximity and size of the restatements, just seven months after the Individual Defendants firm and rosy representations of revenue, backlog, and realization add further strength to the strong circumstantial evidence of scienter."). On August 7, 2023, the Company reiterated its €5 billion guidance for 2023, yet by then the FDA advisory committee had already recommended the new vaccine. The temporal proximity between the August 7, 2023 statements and the October 16, 2023 admission disclosing the likely €900 million write-off further enhances the inference of scienter. ¶¶160, 174. Although Defendants rely on *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015), to dispute this allegation (Defs. Br. at 22 n.15), that case merely says that temporal proximity *alone* does not raise an inference of scienter. Here, temporal proximity, along with other factors alleged in the Complaint, collectively, raise a strong inference of scienter.

Further, "the magnitude of [Defendants'] post-class period write-off" serves as additional evidence of scienter. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *accord In re*

*Scholastic*, 252 F.3d at 77 (finding that $24 million of "special charges," combined with allegation that product in question was being returned in great numbers by purchasers during period of those charges, undermines an inference that defendants were unaware of the falsity of their statements that product was selling well); *see also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS 199809, at *48 (S.D.N.Y. Nov. 26, 2018) (size of loss supported inference of scienter).

　　　　Defendants knew the shift in vaccine formulations would trigger a write-off. Defendants admitted to knowing that formulation changes in the vaccines would lead to write-offs for obsolescence. These formulation changes were planned for mid-2023 and were expected to be much larger than previous changes, thereby cementing the likelihood of a massive write-off. ¶175. Thus, the only plausible inference is that Defendants knew but delayed disclosing the write-off they ultimately disclosed at the end of the Class Period.

*　　　　　*　　　　　*

　　　　Plaintiffs' allegations of scienter are certainly "cogent and at least as compelling as any opposing inference," which is all that is required at the pleading stage. *Tellabs*, 551 U.S. at 322-23; *Altimeo*, 19 F.4th at 150 (warning courts not to "mistake heightened pleading standards for impossible ones"). Plaintiffs' inference of scienter easily outweighs Defendants' implausible competing explanation, which asserts that they were unaware of cancellations for orders that they oversaw and claimed to understand, unaware of formulation changes expressly described in known meetings with regulators, and unaware that obsolete or expired inventory would require write-offs when they had been required to take such write-offs in the past. Defs. Br. at 21-22, 25. None of these highly implausible inferences has any basis in fact. More importantly, none is as cogent as the simple theory proffered by Plaintiffs that Defendants avoided telling the truth to investors until

22

a write-off by their partner Pfizer forced them to do so. *See Stadium Capital*, 2024 U.S. Dist. LEXIS 19754, at \*23 ("supposed evidence of good faith is just as likely to show bad faith or not to be especially probative at all").

### C.    Şahin and Holstein Are Liable as a "Control Person" under Section 20(a).

Plaintiffs have adequately pleaded an underlying primary violation, as discussed above. Thus, Defendants' motion to dismiss Plaintiffs' "control person" claim should be denied. *See Altimeo*, 19 F.4th at 152.

## V.    CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.[3]

[*Signature blocks on following page*]

---

[3] In the event that the Court is inclined to grant any aspect of Defendants' motion, Plaintiff respectfully requests leave to file an amended complaint to address any deficiencies in the current allegations. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

Dated: January 17, 2025                    **LEVI & KORSINSKY, LLP**


                                           */s/ Adam M. Apton*
                                           Adam M. Apton
                                           33 Whitehall Street, 17th Floor
                                           New York, New York 10004
                                           Tel.: (212) 363-7500
                                           Fax: (212) 363-7171
                                           Email: aapton@zlk.com

                                           *Counsel for Lead Plaintiff*
                                           *and Lead Counsel for the Class*

                                               -and-

                                           Joshua B. Silverman
                                           Brian P. O'Connell
                                           POMERANTZ LLP
                                           Ten South LaSalle Street, Suite 3505
                                           Chicago, Illinois 60603
                                           Tel.: (312) 377-1181
                                           Fax: (312) 377-1184
                                           Email: jbsilverman@pomlaw.com
                                           Email: boconnell@pomlaw.com

                                           *Counsel for Additional Plaintiff*
                                           *and Additional Counsel for the Class*


## WORD COUNT CERTIFICATION

I, Adam M. Apton, certify that the foregoing brief contains 7,050 words (not including the tables of contents or authorities, captions, index, signature blocks, or required certifications). This certification is made pursuant to the Court's Individual Rules of Practice in Civil Cases, Paragraph 4.B. Executed this 17th day of January 2025.


                                           */s/ Adam M. Apton*
                                           ADAM M. APTON


24