UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>
DOCDEER FOUNDATION; ADRIANO
LADEWIG; and XIA RONGPENG, <em>individually
and on behalf of all others similarly situated</em>,

Plaintiffs,

-v.-

BIONTECH SE; UĞUR ŞAHIN; and JENS
HOLSTEIN,

Defendants.
</td>
<td>
24 Civ. 5310 (KPF)

**OPINION AND ORDER**
</td></tr>
</table>

KATHERINE POLK FAILLA, District Judge:

A German biotechnology company sought to do well by doing good — to disseminate vaccines worldwide in order to ameliorate the devastating effects of the COVID-19 pandemic, while at the same time earning substantial profits for the company and its shareholders. However, to paraphrase William Shakespeare, the course of the pandemic never did run smooth, and in late 2023, the company was forced to take a substantial charge against earnings.

Lead Plaintiff Docdeer Foundation, along with Named Plaintiffs Adriano Ladewig and Xia Rongpeng (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, brought this securities class action against the German biotechnology company, BioNTech SE ("BioNTech"), and BioNTech executives Uğur Şahin ("Şahin") and Jens Holstein ("Holstein," together with Şahin, the "Individual Defendants," and collectively with BioNTech, "Defendants"). Plaintiffs assert securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R.

§ 240.10b-5.  Specifically, they claim that Defendants made 28 alleged misstatements about (i) the demand for their COVID-19 vaccine Comirnaty and (ii) inventory risks related to write-offs.

Before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint (the "FAC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  For the reasons set forth in the remainder of this Opinion, the Court grants Defendants' motion in full.

<h2 style="text-align:center">BACKGROUND[1]</h2>

**A.    Factual Background**

**1.    The Parties**

Founded in 2008 by Defendant Şahin and Christoph Huber, Defendant BioNTech is a German biotechnology company that develops and commercializes vaccines and immunotherapies for cancer and other infectious

---

[1]    This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #40)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #64) and the appendix attached thereto as "Def. App'x"; to Plaintiffs' memorandum of law in opposition to the motion to dismiss as "Pl. Opp." (Dkt. #66); and to Defendants' reply memorandum of law in further support of the motion to dismiss as "Def. Reply" (Dkt. #69).

The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Sarah Eichenberger ("Eichenberger Decl., Ex. [ ]" (Dkt. #65)), submitted in concert with Defendants' motion to dismiss.

The documents relied upon in the Court's analysis, including the aforementioned exhibits, are either documents incorporated by reference in the FAC or documents required by law to be filed — and actually filed — with the U.S. Securities and Exchange Commission (the "SEC").  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference in the complaint); *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (explaining that a court may take judicial notice of documents "required by law to be filed, and actually filed, with the SEC").

diseases.  (FAC ¶¶ 24, 30).  In 2019, BioNTech went public on the NASDAQ
Global Select Market.  (*Id.* ¶ 31).  BioNTech's American Depositary Shares
("ADSs") trade on NASDAQ under the ticker symbol "BNTX."  (*Id.* ¶¶ 1, 24).  In
addition to founding BioNTech, Defendant Şahin has served as BioNTech's
Chief Executive Officer at all relevant times.  (*Id.* ¶ 25).  Defendant Holstein has
served as BioNTech's Chief Financial Officer since July 2021.  (*Id.* ¶ 26).

Plaintiffs are alleged to have purchased BioNTech's ADSs on a domestic
exchange between March 30, 2022, and October 13, 2023 (the "Class Period").
(FAC ¶¶ 1, 23).

### 2. BioNTech's Development and Commercialization of the Comirnaty Vaccine Throughout the COVID-19 Pandemic

In January 2020, BioNTech initiated the BNT162 vaccine program, aimed
at preventing the spread of the COVID-19 virus.  (FAC ¶ 32).  On April 9, 2020,
BioNTech entered into an agreement (the "Collaboration Agreement") with Pfizer
Inc. ("Pfizer").  (*Id.*).  Effective as of March 17, 2020, the Collaboration
Agreement governed the research, development, and eventual
commercialization of the COVID-19 vaccine.  (*Id.*).  Under the Collaboration
Agreement, Pfizer led the development of and sought regulatory approval for
vaccine candidates in the United States, and BioNTech carried out the same
responsibilities in Europe.  (*Id.* ¶ 34).  The Collaboration Agreement also
provided that Pfizer and BioNTech would split costs and profits evenly, and
that any reduction in revenue, including write-offs by either company, would
be recognized by the other company.  (*Id.* ¶ 35).  It established (i) the Joint
Steering Committee, to ensure that decisions were made jointly and

information was shared between the two parties; (ii) the Joint Commercialization Committee, which handled pricing, marketing, and patient access programs and established packaging guidance; and (iii) the Joint Finance Committee, which handled financial forecasting and budgeting.  (*Id.* ¶¶ 36-41).

Together, BioNTech and Pfizer developed Comirnaty, a messenger RNA ("mRNA") vaccine for COVID-19.  (FAC ¶ 2).  *See generally Ass'n for Molecular Pathology* v. *Myriad Genetics, Inc.*, 569 U.S. 576, 581-82 (2013) (discussing messenger RNA technology); *Coughlin* v. *N.Y. State Unified Ct. Sys.*, No. 22 Civ. 4002 (FB) (JMW), 2023 WL 7091904, at *2 (E.D.N.Y. Oct. 26, 2023) (same, in the context of COVID-19 vaccines), *appeal dismissed*, No. 24-101, 2024 WL 3335171 (2d Cir. May 30, 2024).  In December 2020, Comirnaty was authorized for conditional or emergency use in the United States and Europe, making it the first mRNA COVID-19 vaccine to be authorized for human use.  (*Id.* ¶¶ 2, 45).  By February 2021, the United States government and the European Commission (the "EC") had, respectively, ordered 300 million and 500 million doses of Comirnaty.  (*Id.* ¶¶ 46-47).  The value of doses ordered by the United States was approximately $5.85 billion, and the value of doses ordered by the EC was approximately €7.75 billion.  (*Id.*).

In May 2021, the EC announced that it had signed another contract (the "EC Contract"), obligating it to purchase 900 million doses of Comirnaty, with 450 million doses to be delivered in 2022.  (FAC ¶ 48).  The EC Contract also provided the EC with the option to purchase an additional 900 million doses of

Comirnaty by the end of 2023.  (*Id.*).  If fully executed, the EC Contract would have produced revenue of up to €35.1 billion, for 1.8 billion doses of Comirnaty.  (*Id.*).  In July and October 2021, the United States agreed to purchase a total of 250 million additional doses, and in December 2021, the EC exercised its option to purchase 200 million additional doses, bringing its total to 650 million doses.  (*Id.* ¶¶ 50, 52).  Throughout 2021, other countries also ordered hundreds of millions of doses from Pfizer and BioNTech.  (*Id.* ¶ 53).

Meanwhile, on September 22, 2021, BioNTech announced that the U.S. Food and Drug Administration (the "FDA") had issued an Emergency Use Authorization (or "EUA") for a booster dose of Comirnaty.  (FAC ¶ 51).  But according to the FAC, there was "an enormous decline in demand as the 2021 vaccine season ended," caused in part "by the fact that the majority of adults had already been vaccinated by the end of 2021, but only about half had received a single booster, and very few received a second booster."  (*Id.* ¶ 54).  Then, toward the end of 2021, the Omicron variant of COVID-19 became the dominant strain — it "was highly transmissible but had lower risk of hospitalization and death than prior variants," and this "relative lack of severity compared to prior variants contributed to vaccine hesitancy as 2022 progressed."  (*Id.* ¶ 55).  In the winter of 2022, Pfizer and BioNTech began clinical trials on vaccines targeting the Omicron BA.1 sub-lineage.  (*Id.* ¶ 56).  But in March 2022, the FDA expanded the Comirnaty EUA to allow for second booster doses using the original vaccine formula.  (*Id.* ¶ 57).

Plaintiffs allege that, by no later than February 2022, just before the Class Period began, Pfizer and BioNTech were aware of "dwindling demand and [a] mounting surplus of COVID-19 vaccines." (FAC ¶ 58). To support that allegation, they point to (i) a press release by Oxfam International, a global nonprofit organization, predicting that the European Union would need to throw away 55 million doses of COVID-19 vaccines by the end of February 2022; and (ii) an article published by *Le Monde*, noting that more than 240 million doses of COVID-19 vaccines had passed their expiration since the beginning of the vaccination campaign and that 73% were from Pfizer and BioNTech. (*Id.* ¶¶ 58-59). Plaintiffs contend that the "decline in demand and growing risk of nonviable, unmarketable inventory was particularly evident in central and Eastern Europe, where [European Union] member states had already begun to complain that they were oversupplied and expressed that their current purchase agreements needed to be renegotiated because Pfizer and BioNTech should not be able to require them to buy millions of unneeded vaccines only to destroy the doses when they expired." (*Id.* ¶ 60). Plaintiffs claim that this trend had started to take place by February 2022, citing to the example of Romania, which allegedly refused to take delivery of 28 million doses of Comirnaty, worth approximately €550 million. (*Id.* ¶¶ 4, 60).

On March 30, 2022, the first day of the Class Period, BioNTech announced its fourth quarter and full year 2021 financial results in a press release (the "Q4/FY21 Earnings Release") and filed an annual report on Form 20-F with the SEC (the "2021 Form 20-F"). (FAC ¶¶ 61-62, 64, 66). The

Q4/FY21 Earnings Release and 2021 Form 20-F reported that: (i) as of mid-March 2022, BioNTech and Pfizer had signed orders for approximately 2.4 billion doses of Comirnaty to be delivered in 2022 (which included agreements with the United States, the European Union, the United Kingdom, Japan, and Canada); (ii) discussions regarding additional dose commitments were ongoing; (iii) based on the EC Contract, signed in May 2021, with the EC having exercised its option for additional doses in December 2021, the total number of doses to be delivered to EC member states in 2022 totaled more than 650 million; and (iv) the total number of doses delivered to the EC, inclusive of all agreements, was expected to be up to 2.4 billion by the end of 2023.  (*Id.* ¶¶ 62, 64).  The 2021 Form 20-F also reported inventory write-offs and reserves totaling €194.6 million related to the Comirnaty vaccine, as a result of those inventories "not fulfilling the predefined quality-specifications" or "regulatory requirements," such as shelf-life expiration.  (*Id.* ¶ 66).

On April 6, 2022, the FDA Vaccine and Related Biologic Products Advisory Committee held an open meeting to discuss COVID-19 vaccines, including the need for new vaccine versions to address mutating strains of the virus, such as Omicron and other newly emerging subvariants.  (FAC ¶ 68). Also in April 2022, Poland's Health Minister announced that the Polish government had stopped taking deliveries of Comirnaty, citing a *force majeure* clause in its contract with Pfizer and BioNTech and claiming that Russia's February 2022 invasion of Ukraine, which drove millions of refugees to Poland, had drained its public finances.  (*Id.* ¶ 69).  Pfizer responded by suing Poland

7

for payment for 60 million doses under the EC Contract.  (*Id.*).  Then, on April 29, 2022, the prime ministers of Estonia, Latvia, and Lithuania sent a joint letter to the EC president, expressing concerns about their then-existing surpluses of COVID-19 vaccines, including Comirnaty, and unmatched demand.  (*Id.* ¶ 70).  The joint letter also related the member states' belief that Pfizer and BioNTech might be violating a "Reasonable Best Efforts" obligation in the EC Contract, by delivering doses that were up to halfway through their shelf life.  (*Id.* ¶ 71).  The short shelf life of the received doses and restrictions on vaccine donations were "almost restrict[ing] the possibility of ensuring that vaccines [could be] effectively used," and the member states wanted solutions that would permit them to "avoid huge wastage of vaccines and financial losses for national budgets."  (*Id.* ¶¶ 71-72).

Further, as alleged by Plaintiffs, on May 20, 2022, *Politico* published an article stating that European Union member states were pressuring the EC to renegotiate the EC Contract, and that the European Union had discarded 55 million doses of COVID-19 vaccines because of the improving pandemic situation and "leveling off of vaccination campaigns."  (FAC ¶ 79).  That month, Pfizer and BioNTech announced an agreement with the EC to amend their originally agreed upon contractual delivery schedules:  Deliveries scheduled for June through August 2022 would be "rephase[d]" to September through the end of the fourth quarter of 2022.  (*Id.* ¶ 94).  BioNTech's Form 6-K filed with the SEC in May 2022 attached a contemporaneous press release dated May 16, 2022, which provided this update regarding the EC Contract to the public.

8

(Eichenberger Decl., Ex. E at 6-12).[2]  The press release stated that the amendment to the EC Contract was intended to "help support the [EC] and Member States' ongoing immunization programs, and [was] aligned to the companies' commitment to working collaboratively to identify pragmatic solutions to address the evolving pandemic needs."  (*Id.* at 6).

In June 2022, European countries continued to call for reductions in the amount of vaccines being ordered and for renegotiation of contracts with producers.  (FAC ¶¶ 79-83).[3]  The same month, the FDA notified BioNTech and Pfizer that it recommended the development of a bivalent COVID-19 vaccine, which would target two different strains of the disease — the original COVID-19 strain and the Omicron sub-lineages.  (*Id.* ¶ 86).[4]

On August 8, 2022, BioNTech issued its earnings release for the second quarter of 2022 (the "Q2 2022 Earnings Release"), which stated that the

---

[2]   The Court considers the press release in deciding this motion to dismiss because it is attached to and included as part of the Form 6-K, a document required by law to be filed and actually filed with the SEC.

[3]   Plaintiffs allege that demand was also declining in the United States, as purportedly observed by Confidential Witness 1 ("CW1"), a Vaccine and Health Science Specialist at Pfizer from March 2018 to August 2022 and a U.S. Comirnaty Navigator Account Specialist after August 2022.  (FAC ¶ 84).  Plaintiffs allege that CW1 also observed that an increasing number of doctors did not want to administer the vaccine and were pushing the task to pharmacies, and that patients were more reluctant to pursue booster shots.  (*Id.*).  CW1 provided reports to Pfizer, and the Collaboration Agreement required information to be shared with BioNTech.  (*Id.* ¶ 85).  Nonetheless, in June 2022, Pfizer and BioNTech entered into a new vaccine supply agreement with the U.S. government, providing the United States with 105 million doses, potentially including the Omicron-adapted vaccine should one be approved by the FDA, with an option to purchase an additional 195 million doses.  (*Id.* ¶ 94).

[4]   A monovalent vaccine contains one strain of the virus in question, while a bivalent vaccine contains two strains.  *See generally* Ronen Arbel & Yael Wolff-Sagy, *The Superiority of Bivalent Over Monovalent Booster Vaccines*, 23 Lancet 1324 (2023), available online at https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(23)00424-3/fulltext.

amendment to the EC Contract to rephase deliveries "did not impact the ... full-year 2022 revenue guidance or the full-year commitment of doses to be delivered to EC Member States in 2022." (FAC ¶¶ 87, 94). In its Form 6-K report (the "Q2 2022 Form 6-K"), also filed with the SEC on August 8, 2022, BioNTech stated that "inventory write-offs and reserves related to [its] COVID-19 vaccine amounting to €247.1 million and €403.1 million, respectively, were recognized in cost of sales as a result of the planned introduction of a new COVID-19 vaccine formulation and the potential switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine." (*Id.* ¶¶ 96-97). The Q2 2022 Form 6-K also expressed that "the development of the pandemic remain[ed] dynamic" and that the "potential switch" in vaccines could cause a "re-phasing of orders from those made earlier in the year to a later time in the year." (*Id.* ¶ 99). While this change was causing "fluctuations in quarterly revenues which [BioNTech] expect[ed] to remain over the rest of the financial year," BioNTech also expected "an uptake in demand ... in the fourth quarter of 2022 related to the Omicron-adapted bivalent vaccine, subject to regulatory approval." (*Id.*).

A bivalent Comirnaty vaccine was authorized by the FDA and the European Medicines Agency ("EMA") on August 31, 2022, and September 1, 2022, respectively. (FAC ¶ 101). Pfizer and BioNTech began shipping the bivalent COVID-19 vaccines soon thereafter. (*Id.* ¶ 106). In November 2022, BioNTech announced its financial results for the third quarter of 2022 and reported that as of mid-October 2022, BioNTech and Pfizer had invoiced

approximately 300 million doses of the adapted bivalent vaccine.  (*Id.* ¶¶ 105-106).  In its earnings release (the "Q3 2022 Earnings Release"), BioNTech also communicated that it "expect[ed] to invoice up to 2.1 billion doses of the COVID-19 vaccine in 2022," while reporting that "[s]ome dose deliveries ha[d] been shifted into 2023 due to the evolving dynamics of demand."  (*Id.* ¶ 106).  BioNTech again referenced write-offs, explaining that they had occurred "due to the switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine and further raw materials reserves."  (*Id.* ¶¶ 108, 111).

From November 2022 through the beginning of 2023, European countries continued to push for postponement or cancellation of unnecessary vaccine deliveries.  (FAC ¶¶ 113-115).  Then, on a call with investors and analysts on January 31, 2023, Pfizer CEO Albert Bourla stated that the companies had "sold [in 2022] … more doses than were eventually used[, which] resulted in a government inventory build that [Pfizer] expect[ed] to be absorbed some time in 2023[,] probably the second half of the year."  (*Id.* ¶ 117).  According to Plaintiffs, "BioNTech ultimately acknowledged … the impact of this inventory overhang but was less candid with its investors."  (*Id.* ¶ 118).  On March 27, 2023, BioNTech announced its fourth quarter and full year 2022 financial results (the "Q4/FY22 Earnings Release").  (*Id.*).  The Q4/FY22 Earnings Release forecasted approximately €5 billion in vaccine revenue for the 2023 financial year, which was below market estimates by about €3 billion.  (*Id.*).  It also provided the information that Pfizer and BioNTech had invoiced approximately 2 billion doses of Comirnaty in 2022,

including about 550 million doses of the bivalent vaccine, and that the companies had announced in January 2023 that negotiations for the rephasing of delivery timelines with the EC were "ongoing." (*Id.* ¶ 121). BioNTech's ADS price fell $4.60 per share on the date of that reporting. (*Id.* ¶ 120). Finally, the Form 20-F filed on March 27, 2023 (the "2022 Form 20-F") provided that write-offs driven by the switch from the monovalent to the bivalent vaccine had occurred. (*Id.* ¶ 127).

On May 8, 2023, BioNTech issued a press release announcing its financial results for the first quarter of 2023 (the "Q1 2023 Earnings Release"). (FAC ¶ 132). The Q1 2023 Earnings Release provided that "[a] re-negotiation of the existing supply contract with the [EC] [was] ongoing, with the potential for a rephasing of deliveries of doses across multiple years and/or a volume reduction." (*Id.*). It also stated that "[w]hile a vaccine adaptation [was] expected to lead to increased demand, fewer primary vaccinations and lowered population-wide levels of boosting [were] anticipated." (*Id.*). The Form 6-K filed on the same date (the "Q1 2023 Form 6-K") communicated the expectation that as "the risk of severe COVID-19 disease and deaths continues especially for high-risk populations, there [would] be continued demand for vaccine boosting and vaccinations, especially for at-risk and immunocompromised groups," and that BioNTech planned to deliver doses that were originally scheduled for 2022 in some geographies to meet this need in 2023. (*Id.* ¶ 135). The Q1 2023 Form 6-K reiterated that the renegotiation of the EC Contract was ongoing and could result in rephasing over a period of years "and/or a volume reduction."

(*Id*.).  Further, it stated that "write-offs due to inventories expected to be unsaleable, not fulfilling the specification defined by [BioNTech's] quality standards, shelf-life expiry[,] or disposals" would impact cost of sales.  (*Id.* ¶ 137).  And the Q1 2023 Form 6-K advised that "[u]ncertainty in the demand for [BioNTech's] COVID-19 vaccine and difficulties in targeting [the] appropriate supply of [its] vaccines ha[d] in the past resulted, and may in the future result, in significant inventory write-offs and cancellations of contract manufacturing orders."  (*Id.* ¶ 139).  Additionally, it warned that "[p]lanned new formulations" of the vaccine, including versions that could protect against new strains of COVID-19, could result in write-offs of inventory, as had occurred in the past.  (*Id.* ¶ 141).

BioNTech's reporting for the second quarter of 2023, released on August 7, 2023, expressed similar information regarding write-offs.  (FAC ¶¶ 148, 156).  It announced that BioNTech was preparing for the launch of an Omicron XBB.1.5-adapted monovalent vaccine, as recommended by the FDA and the EMA (*id.* ¶ 148), and that those planned new formulations could result in write-offs (*id.* ¶ 156).  The Form 6-K filed on that date (the "Q2 2023 Form 6-K") also stated that Pfizer and BioNTech had reached an agreement with the EC to again amend the EC Contract; the amendments rephased delivery of doses annually through 2026 and included an aggregate volume reduction to provide "additional flexibility for EU Member States."  (*Id.* ¶ 152).

Ultimately, on October 13, 2023, Pfizer issued a press release announcing that "lower-than-expected utilization" of its COVID-19 "products"

13

had resulted in a non-cash charge of $5.5 billion to costs of goods sold in the third quarter of 2023, related to, among other things, "inventory write-offs and other charges for Comirnaty of $0.9 billion." (FAC ¶ 159). Further, Pfizer was reducing its full-year 2023 revenue expectations for the vaccine by approximately $2 billion, "due to lower-than-expected vaccination rates." (*Id.*). On October 16, 2023, BioNTech issued a press release announcing that BioNTech was evaluating the impact of Pfizer's write-offs and that BioNTech would likely recognize the effect of Pfizer's inventory write-offs and other charges of up to €0.9 billion in the third quarter of 2023. (*Id.* ¶ 160). BioNTech's ADS price fell $6.61, or 6.38%, and closed at $96.97 per ADS on the day of the announcement. (*Id.* ¶ 164). Plaintiffs allege that they, and other shareholders who invested during the Class Period, sustained significant damages due to purportedly false and misleading statements made by Defendants. (*Id.* ¶¶ 165-166).

### 3. The Alleged Misrepresentations

The FAC alleges that Defendants made 28 misrepresentations and omissions during the Class Period regarding Comirnaty that negatively impacted investors. (*See* FAC ¶¶ 62, 64, 66, 75, 77, 90, 92, 94, 97, 99, 102, 106, 108, 111, 121, 123, 125, 127, 132, 135, 137, 139, 141, 148, 150, 152, 154, 156).[5] In arguing that none of those 28 statements is an actionable

---

[5]    In their memorandum of law, Defendants have helpfully created an appendix identifying each of the 28 alleged misrepresentations in the FAC. (*See* Def. App'x). For convenience, the Court will refer to the putative misstatements using the numbering system contained in Defendants' appendix.

misstatement, Defendants group the statements into two categories: (i) those concerning vaccine contracts with the EC; and (ii) those concerning inventory write-offs.  (*See* Def. Br. 11-18).  In their opposition to the motion to dismiss, Plaintiffs similarly frame the alleged misstatements as being about (i) demand and (ii) inventory risks.  (*See* Pl. Opp. 11-17).  Below, the Court describes the two categories.

### a.    Statements Concerning Vaccine Contracts with the EC and Demand for Comirnaty

The FAC first alleges that Defendants made a series of false and misleading statements regarding demand for Comirnaty.  The first such statement is an excerpt from the Q4/FY21 Earnings Release, dated March 30, 2022, which provided that "[a]s of mid-March 2022, BioNTech and Pfizer ha[d] signed orders for approximately 2.4 billion doses in 2022," including contracts with governments around the world.  (FAC ¶ 62, or "Statement #1").  Statement #1 also stated that BioNTech and Pfizer had entered into the EC Contract in May 2021 and that the EC had exercised its option to purchase more doses under that contract in December 2021, bringing the "number of doses to be delivered to EC member states in 2022" to "more than 650 million doses."  (*Id.* (emphasis omitted)).  Finally, Statement #1 communicated that the "total number of potential doses delivered to the EC, inclusive of all agreements, [wa]s expected to be up to 2.4 billion by the end of 2023."  (*Id.* (emphasis omitted)).  Plaintiffs also identify the 2021 Form 20-F as containing misstatements — that filing included the same figures as the Q4/FY21 Earnings Release and stated that "[f]urther discussions for additional dose

15

commitments [we]re ongoing and the order book [wa]s expected to further grow." (*Id.* ¶ 64, or "Statement #2" (emphasis omitted)).

The FAC alleges that Statement #2 was false for multiple reasons, including: (i) it omitted that demand was declining rather than growing because of cancellations by and pushback from some European countries; (ii) the referenced figures in the contracts did not reflect the vaccinated populace and declining consumer interest in boosters; and (iii) it omitted that Pfizer and BioNTech were preparing to propose changes to the vaccine formula that would render existing inventory obsolete. (FAC ¶ 65). For similar reasons, the FAC challenges other statements made throughout the Class Period that communicated the numbers of doses that had been ordered or invoiced. (*See, e.g., id.* ¶ 75, or "Statement #4" (Q1 2022 Earnings Release, reporting that as of the end of April 2022, the companies had signed orders for approximately 2.4 billion doses in 2022); *id.* ¶ 94, or "Statement #8" (Q2 2022 Earnings Release, reporting that as of the beginning of July 2022, the companies had signed orders for approximately 2.5 billion doses in 2022); *id.* ¶ 106, or "Statement #12" (Q3 2022 Earnings Release, reporting that BioNTech expected to invoice up to 2.1 billion doses in 2022); *id.* ¶ 121, or "Statement #15" (Q4/FY22 Earnings Release, reporting that as of December 2022, two billion doses were invoiced in 2022, including 550 million bivalent adapted doses); *id.* ¶ 125, or "Statement #17" (2022 Form 20-F, reporting that approximately two billion doses were invoiced in 2022)).

16

In addition to statements regarding the number of doses contracted for or invoiced, the FAC also challenges statements regarding the negotiation of and amendments to the EC Contract itself.  For example, Statement #8 identifies the following language from the Q2 2022 Earnings Release as a misstatement:

> In May 2022, BioNTech and Pfizer announced an agreement with the … [EC] to amend their originally agreed contractual delivery schedules for the COVID-19 vaccine.  The amendment rephases planned deliveries to help support the EC and Member States' ongoing immunization programs ….  Doses scheduled for delivery in June through August 2022 will now be delivered in September through to the fourth quarter of 2022.  This change of delivery schedule did not impact the companies' full-year 2022 revenue guidance or the full-year commitment of doses to be delivered to EC Member States in 2022.

(FAC ¶ 94 (emphasis omitted)).  The FAC alleges that this language was materially false and misleading because it did not disclose that "demand for vaccines was then falling, rather than being shifted out to later in the year" or that "multiple European countries were refusing to accept delivery of doses." (*Id.* ¶ 95; *see also id.* ¶ 99, or "Statement #10" (Q2 2022 Form 6-K, stating that the progress of the pandemic and the potential switch to a bivalent vaccine caused a re-phasing of orders and fluctuations in quarterly revenues); Statement #15 (stating that as of January 2023, Pfizer and BioNTech had announced that negotiations were ongoing for the rephasing of delivery timelines); FAC ¶ 135, or "Statement #20" (Q1 2023 Form 6-K, stating that the renegotiation of the EC Contract was ongoing, with potential for rephasing across multiple years and a volume reduction); *id.* ¶ 152, or "Statement #26"

(Q2 2023 Form 6-K, stating that Pfizer and BioNTech reached an agreement with the EC that included rephasing delivery of doses through 2026 and an aggregate volume reduction)).

Finally, the FAC challenges two general statements regarding demand. In their Q2 2022 Earnings Release, Defendants expressed:

> In the first half of 2022, we achieved important milestones as we have further strengthened our COVID-19 vaccine leadership and have expanded our broad pipeline and accelerated its maturation. Our COVID-19 product pipeline includes variant-adapted and next-generation vaccine candidates, aimed at prolonged and broad protection[.]

(FAC ¶ 90, or "Statement #6"). In the same Earnings Release, Defendants also declared:

> [W]ith our initiatives around variant-adapted COVID-19 vaccine candidates, we expect an uptake in demand in our key markets in the fourth quarter of 2022, subject to regulatory approval.

(*id.* ¶ 92, or "Statement #7"). Plaintiffs take issue with Statement #6 and Statement #7 on the grounds that they did not disclose that variant-adapted vaccines "would render certain existing inventory obsolete, necessitating write-offs"; that many European countries were seeking to renegotiate their contracts; and that demand was no longer what it was at the height of the pandemic. (*Id.* ¶¶ 91, 93). The FAC also identifies as misleading statements about Defendants' expectations that adapted vaccines could increase demand. (*See* Statement #10 (recognizing fluctuations in revenue due to rephasing but stating expectation that there would be an "uptake" in demand in the fourth quarter related to an Omicron-adapted bivalent vaccine, if approved); FAC

¶ 132, or "Statement #19" (Q1 2023 Earnings Release, stating expectation that vaccine adaptation would lead to increased demand but that fewer primary vaccinations and lower population-wide levels of boosting would occur); Statement #20 (stating expectation of continued demand for vaccination and boosters, especially for at-risk and immunocompromised populations); Statement #26 (same)).

### b.    Statements Concerning Inventory Write-Offs

The FAC next challenges BioNTech's reporting of inventory write-offs, claiming that those statements did not disclose that write-offs were caused in part by declining demand and new formulations targeting new variants, and that they concealed that additional or larger write-offs were a "near certainty." (FAC ¶¶ 78, 98, 109, 112, 124, 126, 128).  One of the alleged misstatements regarding inventory write-offs was made on March 30, 2022, as part of the 2021 Form 20-F.  (*Id.* ¶ 66, or "Statement #3").  On this topic, Statement #3 states that during 2021, "inventory write-offs and reserves related to [BioNTech's] COVID-19 vaccine amounting to €194.6 million were recognized in cost of sales as a result of the respective inventories not fulfilling the predefined quality-specifications … and/or regulatory requirements."  (*Id.*).  Two other alleged misstatements were made at the end of the first quarter of 2022: Defendants reported inventory write-offs that led to an increase in cost of sales (*id.* ¶ 75, or "Statement #4") and explained that they were a "result of the introduction of a new COVID-19 vaccine formulation" (*id.* ¶ 77, or "Statement #5").

Similarly, the FAC identifies Defendants' statements on write-offs in the second, third, and fourth quarters of 2022 as materially false and misleading. (*See* FAC ¶ 97, or "Statement #9" (Q2 2022 Form 6-K, reporting inventory write-offs "as a result of the planned introduction of a new COVID-19 vaccine formulation and the potential switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine"); *id.* ¶ 111, or "Statement #14" (Q3 2022 Form 6-K, reporting inventory write-offs "due to the switch from the BNT162b2 vaccine to an Omicron-adapted bivalent vaccine and further raw materials reserves"); *id.* ¶ 123, or "Statement #16" (Q4/FY22 Earnings Release, reporting that cost of sales was impacted by expenses arising from write-offs); *id.* ¶ 127, or "Statement #18" (2022 Form 20-F, reporting inventory write-offs in the year 2022 due to the switch in vaccines and raw materials reserves)).  While those statements referenced the switch in vaccine formulations to target different strains, Plaintiffs contend that they were still materially false and misleading because they did not communicate that BioNTech was "experiencing a decline in demand which made further inventory write-offs a near certainty."  (*Id.* ¶ 98; *see, e.g.*, *id.* ¶ 78).

Finally, the FAC alleges that Defendants' reports of inventory write-offs in 2023 constitute actionable misstatements.  (*See* FAC ¶¶ 137, 139, 141, or "Statement #21," "Statement #22," and "Statement #23" (Q1 2023 Form 6-K, reporting inventory write-offs "due to inventories expected to be unsaleable, not fulfilling the specification defined by [BioNTech's] quality standards, shelf-life expiry or disposals," and warning that "[u]ncertainty in the demand for

[BioNTech's] COVID-19 vaccine and difficulties in targeting appropriate supply
of … vaccines have in the past resulted, and may in the future result, in
significant inventory write-offs and cancellations of contract manufacturing
orders" (emphasis omitted)); *id.* ¶ 150, or "Statement #25" (Q2 2023 Earnings
Release, reporting that estimated revenues "may be influenced by costs such as
inventory write-offs" (emphasis omitted)); *id.* ¶¶ 154, 156, or "Statement #27"
and "Statement #28" (Q2 2023 Form 6-K, reporting expenses from inventory
write-offs due to, *inter alia*, shelf-life expiry or disposals, and stating that
planned new formulations and adaptations of the COVID-19 vaccine had in the
past and could in the future result in "redundant production capacities")).

## B.   Procedural Background

Plaintiffs initiated this action by filing the original class action complaint
on January 12, 2024, in the United States District Court for the Central
District of California.  (Dkt. #1).  On April 4, 2024, Docdeer Foundation was
appointed as lead plaintiff.  (Dkt. #36).  After the parties filed a stipulation
setting a briefing schedule (Dkt. #37), Plaintiffs filed the FAC on June 10, 2024
(Dkt. #40).  Subsequently, the case was transferred to this District and
assigned to the undersigned.  (Dkt. #41-43; July 15, 2024 Minute Entry).

On July 17, 2024, this Court informed the parties of its requirement for
pre-motion submissions to request a pre-motion conference before filing a
motion to dismiss.  (Dkt. #47).  On September 18, 2024, Defendants filed a
letter motion regarding their anticipated motion to dismiss.  (Dkt. #58).
Plaintiffs filed their letter response on September 23, 2024.  (Dkt. #59).  After

reviewing those submissions, the Court dispensed with its pre-motion conference requirement and ordered the parties to meet and confer and to propose a briefing schedule for Defendants' motion to dismiss, which the Court suggested might include, if appropriate, an opportunity for Plaintiffs to amend the FAC.  (Dkt. #60).  On October 2, 2024, the parties submitted a proposed stipulation and order setting out a briefing schedule (Dkt. #61), which the Court entered (Dkt. #62).

On November 18, 2024, Defendants filed their motion to dismiss the FAC.  (Dkt. #63).  On January 17, 2025, Plaintiffs filed their memorandum of law in opposition to the motion to dismiss.  (Dkt. #66).  And on March 13, 2025, Defendants filed their reply memorandum of law in further support of their motion to dismiss.  (Dkt. #69).

## DISCUSSION

Plaintiffs assert claims for violations of (i) Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants and (ii) Section 20(a) of the Exchange Act against the Individual Defendants.  (FAC ¶¶ 185-200).  Broadly speaking, Plaintiffs do not allege that Defendants' statements at issue are literally false, but rather that they omit material information and are thus misleading.  The Court sets forth the applicable legal standards before assessing Plaintiffs' claims.

### A.    Applicable Law

#### 1.    Motion to Dismiss Under Rule 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes "facts stated on the face of the complaint" and "documents appended to the complaint or incorporated in the complaint by reference."  *Id.* (internal quotation marks omitted) (quoting *Concord Assocs., L.P.* v. *Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *accord United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  "[W]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

Additionally, when considering a motion to dismiss a securities class action, the court "may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC." *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see id.* ("We stress that our holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings.").

### 2.      Heightened Pleading Standard for Securities Fraud Claims

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Emps.' Ret. Sys. of Gov't of the V.I.* v. *Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). "Prior to the enactment of the [Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4], the sufficiency of a complaint for securities fraud was governed only by [Federal] Rule [of Civil Procedure] 9." *Blanford*, 794 F.3d at 304 (citation omitted). But "[t]he PSLRA builds on Rule 9's particularity requirement, dictating the pleading standard for claims brought under the Exchange Act." *Id.* Accordingly, a complaint alleging securities fraud must satisfy both Rule 9 — specifically Rule 9(b) — and the PSLRA. *See ATSI Commc'ns, Inc.*, 493 F.3d at 99.

First, Rule 9(b) requires that "a party … state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "A securities fraud complaint based on misstatements must [i] specify the statements that the

24

plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). "While Rule 9(b) demands specificity as to the circumstances of an alleged fraud, it allows a plaintiff to 'allege[ ] generally' any requisite state of mind, *e.g.*, '[m]alice, intent, [or] knowledge[.]'" *Genesee Cnty. Emps.' Ret. Sys.* v. *DocGo Inc.*, 773 F. Supp. 3d 62, 78 (S.D.N.Y. 2025) (alterations in original) (quoting Fed. R. Civ. P. 9(b)).

Second, the PSLRA requires plaintiffs to "do more than say that [a defendant's] statements ... were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). To do so, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, where a plaintiff brings a Section 10(b) or Rule 10b-5 claim — for which the requisite state of mind is scienter, namely an "intent to deceive, manipulate, or defraud" — "[S]ection [78u-4(b)(2)(A)] of the PSLRA ... requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with [scienter].'" *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (internal quotation marks omitted) (first quoting *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007); and

then quoting 15 U.S.C. § 78u-4(b)(2)). "To qualify as 'strong' … an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314; *accord Saraf* v. *Ebix, Inc.*, No. 23-1182-cv, 2024 WL 1298246, at *1-3 (2d Cir. Mar. 27, 2024) (summary order).

### 3.    Liability Under Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Section 10(b)'s implementing rule, Rule 10b-5, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). As the Supreme Court has interpreted those provisions, a *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5 consists of six elements: "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 157 (2008); *see also Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).

26

### 4.    Liability Under Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of [that] chapter or of any rule or regulation thereunder" is jointly and severally liable "with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Further, "[a]ny claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pac. Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010) (citing *Rombach*, 355 F.3d at 177-78). Accordingly, "[t]o state a claim of control person liability under § 20(a), 'a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 108).

## B.    Analysis

### 1.    The Court Dismisses Plaintiffs' Section 10(b) Claims

As discussed, to state a *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege six elements, including "a material misrepresentation or omission by the defendant" as well as scienter. *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157. Here, Defendants argue that

27

Plaintiffs have failed to (i) sufficiently allege any actionable material misrepresentation or omission and (ii) plead facts that raise a strong inference of scienter.  (Def. Br. 10-25).  The Court agrees with both bases, each of which independently supports dismissal.

### a.    Plaintiffs Have Failed to Sufficiently Allege Any Actionable Misstatement or Omission

#### i.    Statements Concerning Vaccine Contracts with the EC and Demand for Comirnaty

The Court first considers the alleged misstatements regarding demand for Comirnaty.  (Statements #1, 2, 4, 6, 7, 8, 10, 12, 15, 17, 19, 20, 24, 26). This group of alleged misstatements primarily includes BioNTech's reporting of the number of doses of Comirnaty that had been ordered, including through the EC Contract (Statements #1, 2, 4, 8, 12, 15, 17, 24), and its reporting on the May 2022 and May 2023 amendments to the EC Contract (Statements #8, 10, 15, 20, 26).  Plaintiffs argue that those statements constitute material misrepresentations because, throughout the Class Period, they "perpetuat[ed] the false impression that demand for Comirnaty remained strong and that BioNTech had 2.4 billion doses [of Comirnaty] in its revenue pipeline, with 2.1 billion [doses] to be invoiced in 2022" (Pl. Opp. 13 (citing Statement #12)), when in reality, "many of the 2.4 billion doses … had been cancelled or refused ahead of shipment" (*id.* at 11-12 (*comparing* Statements #1, 12 *with* FAC ¶¶ 63, 107)).  The Court finds that those statements are not actionable.

*First*, having reviewed the FAC and the documents referenced therein, the Court agrees with Defendants that the statements regarding the EC

Contract and amendments thereto were not false or misleading when made and that Plaintiffs erroneously conflate the concept of signed contractual orders with product demand.  (*See* Def. Reply 2).  "It is settled law in this Circuit that no liability arises for 'literally true historical statements that create an implicit promise as to future company success.'"  *Plymouth Cnty. Ret. Ass'n* v. *Array Techs., Inc.*, No. 21 Civ. 4390 (VM), 2023 WL 3569068, at *11 (S.D.N.Y. May 19, 2023) (quoting *River Birch Cap., LLC* v. *Jack Cooper Holdings Corp.*, No. 17 Civ. 9193 (WHP), 2019 WL 1099943, at *4 (S.D.N.Y. Mar. 8, 2019)).  In *Array Technologies, Inc.*, a sister court in this District found that the defendant's statements about its demonstrated ability to reduce costs and leverage its supply chain were not actionable because those statements were "consistent with reasonably available data."  2023 WL 3569068, at *10-11 (quoting *Novak*, 216 F.3d at 309).  The fact that the price of steel, which was an important part of the defendant's supply chain, was rising at the time the disclosures were first made did not make those statements false or misleading.  *Id.* at *11; *see also In re Coty Inc. Sec. Litig.*, No. 14 Civ. 919 (RJS), 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016) ("Once again, however, these alleged misstatements are statements of historical fact, which are not even alleged to be false and could be deemed misleading only if construed to be an implicit promise of continued growth of comparable magnitude or, in other words, an assurance of future performance.  But [the securities laws do] not recognize such a theory of liability, or require corporations to downplay or derogate their accurate historical results.").

Similarly, it is not an actionable misstatement for Defendants to have accurately reported the number of doses ordered under the EC Contract, even where member states had allegedly begun to push back on 2022 deliveries.  At the start of the Class Period, the alleged misstatements reported that Pfizer and BioNTech had signed orders for over 650 million doses of Comirnaty with the EC and for approximately 2.4 billion doses worldwide, which were scheduled for delivery in 2022.  (*See* Statements #1-2).  While the FAC alleges that Romania and Poland had refused deliveries by April 2022, it also states that Poland was seeking to be excused from performance under the EC Contract due to the special circumstances of Russia's invasion of Ukraine.  (*See id.* ¶¶ 60, 69).  The additional alleged fact that Pfizer sued Poland for payment of those refused doses demonstrates that it was *not* a foregone conclusion either that these countries would be permitted to avoid their contractual obligations, or that Defendants would eventually renegotiate the EC Contract to permit a volume reduction of the 650 million doses ordered by the EC.  (*Id.* ¶ 69).  And "[t]he disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."  *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)); *cf. Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.  Moreover, conclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b), and defendants' lack of

clairvoyance simply does not constitute securities fraud[.]" (internal citations omitted)).[6]

> *Second*, the statements are not actionable because they were made during ongoing negotiations.  As EC member states continued to apply pressure on EC governance and vaccine producers, Defendants contemporaneously announced that they had entered into an initial agreement to amend the EC Contract to permit rephasing of June to August 2022 deliveries to later in the year.  (*See* Eichenberger Decl., Ex. E at 6).  When negotiations began again, Defendants reported those ongoing negotiations, even stating that such renegotiation could result in an overall volume reduction rather than a mere rephasing.  (Statements #15, 19, 20).  Defendants were clearly "trying to negotiate a new agreement and maintain [their] relationship with [the EC] throughout the Class Period.*"  See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (summary order) ("*Express Scripts II*").  "[W]here[, as here,] the discussions were ongoing, Defendants did not have a duty to disclose more about the uncertain state of the negotiations."  *Id.* at 14.  The fact that Defendants ultimately agreed with the EC to rephase deliveries for 2022 annually through 2026 and to permit an aggregate volume reduction does not render their earlier statements false or

---

[6]    Further, the Court notes that BioNTech ultimately beat its 2022 guidance, despite later rephasing 2022 deliveries.  (*Compare* Eichenberger Decl., Ex. C at 1 (guidance of €13-17 billion in Comirnaty revenue for 2022), *with id.*, Ex. I at 11 (reporting €17.31 billion in revenue for 2022)).  In comparing its commercial revenues between 2021 and 2022, BioNTech also explicitly attributed the reduction to "decreased demand" for the COVID-19 vaccine.  (*Id.*, Ex. I at 11).

misleading.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.

1993) (holding that defendant's statements suggesting "the hope" of the

company that strategic alliance negotiations would "go well …. did not become

materially misleading when the talks did not proceed well"); *see also In re*

*Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 3338 (ER), 2017 WL

3278930, at *11 (S.D.N.Y. Aug. 1, 2017) ("*Express Scripts I*") ("Where an

outcome is merely speculative, the duty to disclose does not attach."), *aff'd*,

773 F. App'x 9.

    *Third*, the Court finds that parts of several of the alleged misstatements

about demand constitute forward-looking statements that are protected under

the PSLRA's statutory safe harbor, and are therefore not actionable.

(Statements #1, 2, 7, 8, 10, 12, 19, 20, 24, 26).[7]  A "forward-looking statement"

includes (i) "a statement containing a projection of revenues, income … or other

financial items," (ii) "a statement of the plans and objectives of management for

future operations, including plans or objectives relating to the products or

services of the issuer," and (iii) "a statement of future economic performance."

15 U.S.C. § 78u-5(i)(1)(A)-(C); *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223,

246 (2d Cir. 2016).  Under the safe-harbor provision, a defendant is not liable if

(i) "the forward-looking statement is identified and accompanied by meaningful

---

[7]    "'[A] statement may contain some elements that look forward and others that do not,'
       and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements."
       *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (quoting *Iowa Pub.*
       *Emps.' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)).  In the FAC,
       Plaintiffs include large excerpts from BioNTech's announcements and SEC reports, and
       only parts of those statements contain forward-looking elements.

cautionary language," (ii) the forward-looking statement "is immaterial," or (iii) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *see also Okla. L. Enf't Ret. Sys.* v. *Telefonaktiebolaget LM Ericsson*, No. 18 Civ. 3021 (JMF), 2020 WL 127546, at *8 (S.D.N.Y. Jan. 10, 2020) (discussing analogous "bespeaks caution" doctrine).

In turn, "meaningful cautionary language" means language that "convey[s] substantive information" and is not "[v]ague." *In re Vivendi*, 838 F.3d at 247 (internal quotation marks omitted) (quoting *Slayton*, 604 F.3d at 772). It must identify "important factors that could realistically cause results to differ materially" from those projected by the forward-looking statements. *Slayton*, 604 F.3d at 773; *see* 15 U.S.C. § 78u-5(c)(1)(A)(i). "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials — including the cautionary language — to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)); *see also In re Checkpoint Therapeutics Sec. Litig.*, No. 24 Civ. 2613 (PAE), 2025 WL 1434400, at *14 (S.D.N.Y. May 19, 2025).

Throughout the FAC, Plaintiffs challenge Defendants' statements about expected orders for Comirnaty and potential future demand for Comirnaty.

33

(FAC ¶¶ 63, 65, 93, 95, 100, 107, 133, 136, 149, 153 (challenging Statements #1, 2, 7, 8, 10, 12, 19, 20, 24, 26)).  The Court finds that those statements clearly constitute projections of revenue or income and future economic performance, as they articulate BioNTech's expectations (i) for the number of "potential doses" to be delivered to the EC by 2023; (ii) that, early in the Class Period, BioNTech's "order book [was] expected to further grow"; (iii) that there would be an "uptake in demand" due to BioNTech's efforts to adapt Comirnaty for emerging variants, subject to regulatory approval; and (iv) that there would be continued demand for vaccine boosting and vaccination, especially for at-risk and immunocompromised groups.  (*See, e.g.*, Statements #1, 2, 7, 10, 12, 19, 20, 26).  *See Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends* v. *Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 538 (S.D.N.Y. 2023) ("*Peloton I*") (determining that statements were forward-looking where they related to future demand for products); *Steamfitters Loc. 449 Pension Plan* v. *Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 361 (S.D.N.Y. 2019) (same), *aff'd sub nom. Cavalier Fundamental Growth Fund* v. *Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020) (summary order); *see also Gray* v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 386 (S.D.N.Y. 2020) (finding that statements about management projections "f[e]ll squarely within" the PSLRA's definition of forward-looking statements), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order).

The Court also finds that those statements were accompanied by meaningful cautionary language.  As but one example, while Defendants

communicated in BioNTech's 2021 Form 20-F their expectation that their order book would grow and that the number of potential doses to be delivered to the EC in 2023 could be up to 2.4 billion, the same document included a detailed cautionary statement section regarding forward-looking statements. (Eichenberger Decl., Ex. B at 3). The factors that BioNTech identified as potentially impacting Defendants' forward-looking statements included: BioNTech's "pricing and coverage negotiations ... with governmental authorities"; "the extent to which a COVID-19 vaccine continues to be necessary in the future"; BioNTech's "expectations regarding the size of the patient populations for [its] product candidates, if approved for commercial use"; and "the impact of the COVID-19 pandemic on [its] development programs, supply chain, collaborators, and financial performance." (*Id.*). Similarly, even as BioNTech expressed in its Q2 2022 Earnings Release that it expected an "uptake in demand" due to its "initiatives around variant-adapted COVID-19 vaccine candidates" (Statement #7), that release recognized that it "contain[ed] forward-looking statements" and pointed investors to the risk factors in BioNTech's Q2 2022 Form 6-K and subsequent SEC filings (Eichenberger Decl., Ex. F at 9). The Q2 2022 Form 6-K, in turn, cautioned that "[BioNTech] may be unsuccessful in adapting [its] COVID-19 vaccine or developing future versions of [its] COVID-19 vaccine to protect against variants of the SARS-CoV-2 virus, and even if [it was] successful, a market for vaccines against these variants may not develop." (*Id.* at 31 (emphasis omitted)). Those warnings, which BioNTech repeated throughout the Class Period, detailed how

the developing COVID-19 pandemic could impact BioNTech's business.  (*See, e.g.*, Eichenberger Decl., Ex. G at 8, 30 (incorporating risk warnings in Q3 2022 Form 6-K, including that the market for adapted vaccines might not develop and products may not "gain … market acceptance among physicians [or] patients"); *id.*, Ex. M at 6, 17 (incorporating risk warnings in Q1 2023 Form 6-K, including "the extent to which a COVID-19 vaccine, including any booster shot, continues to be necessary beyond the current pandemic" and "the ability of countries and jurisdictions to store and distribute doses" of the vaccine). The Court finds that the language used in those cautionary statements "is sufficiently specific to shield Defendants from liability for their forward-looking statements."  *Peloton I*, 665 F. Supp. 3d at 539.

*Fourth* and finally, Defendants' statements that BioNTech had "achieved important milestones[,] … strengthened [its] COVID-19 vaccine leadership[,] and … expanded [its] broad pipeline" (Statement #6) are mere "expressions of puffery and corporate optimism [that] do not give rise to securities violations," *Rombach*, 355 F.3d at 174; *see also id.* ("Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)); *accord City of Hialeah Emps.' Ret. Sys.* v. *Peloton Interactive, Inc.*, — F.4th —, No. 24-2803, 2025 WL 2457758, at *3 (2d Cir. Aug. 27, 2025)

("*Peloton II*"). For all of these reasons, the Court finds that Plaintiffs have failed to plead an actionable misstatement or omission concerning the EC contracts and demand for Defendants' COVID-19 vaccines.

### ii. Statements Concerning Inventory Write-Offs

Next, the Court considers the alleged misstatements about inventory write-offs. While the FAC quotes from statements in which the Defendants recognized that inventory write-offs had occurred and might again in the future occur (Statements #3, 4, 5, 9, 13, 14, 16, 18, 21, 22, 23, 25, 27, 28), Plaintiffs argue that those statements still "concealed from investors the larger and more severe impact" of the delivery refusals and cancellations by European countries and the "obsolescence of inventory" caused by new formulations of Comirnaty — which, Plaintiffs claim, "all but guaranteed" a "massive [future] inventory write-off." (Pl. Opp. 13, 15). For this category as well, the Court finds that Plaintiffs have not adequately pleaded that the statements were false or misleading when made.

Defendants informed the public once write-offs were occurring. (*See* Statement #3 (2021 Form 20-F, reporting, on the first day of the Class Period, that write-offs had occurred in the year 2021)). Their representations about write-offs included the fact that the "effects were driven by the introduction of a new COVID-19 vaccine formulation" (*see* Statement #18), and that the "inventories [were] expected to be unsaleable" (*see* Statement #21). As the Class Period continued, the warnings became more robust, with BioNTech informing the public that "[u]ncertainty in the demand for [its] COVID-19

37

vaccine and difficulties in targeting appropriate supply of [its] COVID-19 vaccines [had] in the past resulted, and may in the future result, in significant inventory write-offs and cancellations of contract manufacturing orders." (Statement #22 (emphasis omitted); *see also* Statement #23, 28).

"The key question in considering the misleading nature of a statement is whether defendants' representations, taken together and in context, would have misled a reasonable investor." *Peloton I*, 665 F. Supp. 3d at 541-42 (alterations adopted) (internal quotation marks omitted) (quoting *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020). Because Defendants "disclose[d] to the investing public that [BioNTech] knew that" write-offs had occurred and could occur in the future, and because "a full review of Defendants' public disclosures would have given the investing public the information it needed to make an informed decision about [BioNTech's] stock," the Court finds that Plaintiffs have failed to plead sufficient facts to show actionable misrepresentations or omissions by Defendants concerning write-offs. *Id.* at 542; *see In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."); *see also Sable* v. *Southmark/Envicon Cap. Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute

actionable fraud." (quoting *Decker* v. *Massey-Ferguson, Ltd.*, 543 F. Supp. 873, 880 (S.D.N.Y. 1981), *aff'd in part, rev'd in part*, 681 F.2d 111 (2d Cir. 1982)).

In sum, having considered each of the 28 alleged misstatements, the Court finds that none constitutes an actionable misrepresentation or omission. Therefore, Plaintiffs' Section 10(b) claims fail.

### b.    Plaintiffs Have Failed to Sufficiently Allege a Strong Inference of Scienter

Even assuming that Plaintiffs had plausibly alleged that Defendants made materially false or misleading statements or omissions, which they have not, Plaintiffs' Section 10(b) and Rule 10b-5 claims would still fail because they have failed to sufficiently allege scienter. As discussed, scienter is a "wrongful state of mind" or "'an intent to deceive, manipulate, or defraud.'" *Express Scripts II*, 773 F. App'x at 14 (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000)). To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the [Defendants] acted with [that] state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs may do so by alleging facts "[i] showing that the defendants had both motive and opportunity to commit the fraud or [ii] constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns Inc.*, 493 F.3d at 99.

Plaintiffs attempt to plead scienter by putting forth what they characterize as "five compelling pieces of circumstantial evidence of conscious misbehavior or recklessness." (Pl. Opp. 17).[8] The *first* and *second* pieces of

---

[8]    The FAC does not allege any facts showing that Defendants had both motive and opportunity to commit the alleged fraud. In fact, Defendants repurchased BioNTech's

purported evidence, which the Court considers in tandem, are that Defendants
(i) had actual knowledge of the allegedly omitted information, namely, that they
knew that "demand for Comirnaty had cratered because multiple European
countries had refused to accept future deliveries and/or cancelled their existing
orders," and that "excess Comirnaty inventory had turned obsolete due to the
emergence of new [COVID]-19 variants"; and (ii) induced reliance by portraying
themselves as being knowledgeable about Comirnaty.  (*Id.* at 18-20).  As an
initial matter, Plaintiffs grossly overstate the scope and impact of certain
countries' refusals and cancellations, and they overlook the contemporaneous
and fully disclosed negotiations to address evolving EC needs.  In other words,
BioNTech *did* disclose that those negotiations with the EC were occurring and
warned of the risks that new variants of COVID-19 posed.  (*See supra* B.1.a).
That makes this case easily distinguishable from those on which Plaintiffs rely
in making this argument.  (Pl. Opp. 18 (citing *Christine Asia Co. Ltd.* v. *Ma*, 718
F. App'x 20, 23 (2d Cir. 2017) (summary order) (finding that plaintiffs
adequately pleaded strong circumstantial evidence of scienter by alleging that
high-level company officers and managers attended a secret meeting, where
they discussed the "huge potential impact" of a government administration's

---

ADSs during the Class Period, which would undermine such any such allegations.  (*See*
Eichenberger Decl., Ex. G at 7).  *See Avon Pension Fund* v. *GlaxoSmithKline PLC*, 343 F.
App'x 671, 673 (2d Cir. 2009) (summary order) ("Three of the four individual defendants
increased their net holdings of GSK stock during the class period, and the fourth
individual defendant did not sell any shares at all.  This trading history cannot support
a 'cogent and compelling' inference of fraudulent intent; rather, defendants' purchases
of even more GSK stock during the relevant period signals only confidence in the future
of their company and, by extension, in the commercial success of [the product]." (citing
*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007))).

threat on the company's "imminent IPO"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76-77 (2d Cir. 2001) (finding that plaintiffs adequately pleaded an inference of reckless intent by comparing what defendants knew on a daily, weekly, and monthly basis with defendants' public statements, which "painted a different picture," and with defendants' failure to adjust revenues "despite their knowledge of rapidly rising returns"); *Karimi* v. *Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 397-98 (S.D.N.Y. 2022) (finding that plaintiffs adequately pleaded scienter as to some defendants by identifying government investigations, settlements with regulators, and internal audits that "provided red flags" regarding the bank's deficient practices))).[9]

*Third*, Plaintiffs rely on the "core operations" doctrine, arguing that Comirnaty was critical to BioNTech's operations and earnings, such that the Court can "infer that [the] company and its senior executives ha[d] knowledge of information concerning" that product.  (Pl. Opp. 20 (quoting *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 174 (S.D.N.Y. 2021))).  On its own, however, the "core operations" doctrine may not be enough to satisfy the scienter requirement.  "Because the 'core operations' doctrine predated the enactment of the PSLRA, the Court of Appeals for the

---

[9]     Similarly unavailing are Plaintiffs' efforts to allege scienter based on the Collaboration Agreement with Pfizer.  (Pl. Opp. 19).  The Court agrees with Defendants (*see* Def. Reply 8-9 & n.14) that, in the absence of specific allegations regarding Defendants' participation in the meetings, or the communication of information at odds with Defendants' challenged statements, the mere existence of the Collaboration Agreement fails to satisfy the PSLRA's heightened requirements for pleading scienter.  *Cf. In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90-91 (S.D.N.Y. 2017) (finding corporate scienter where "the Amended Complaint alleges with particularity facts indicating that [company] executives ... had access to information that revealed the statements and omissions to be misleading").

Second Circuit has 'not yet expressly addressed whether, and in what form, the ... doctrine survives as a viable theory of scienter.'" *Yannes* v. *SCWorx Corp.*, No. 20 Civ. 3349 (JGK), 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021) (alteration in original) (quoting *Frederick* v. *Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (summary order)); *see also Bratusov* v. *Comscore, Inc.*, No. 19 Civ. 3210 (KPF), 2020 WL 3447989, at *13 (S.D.N.Y. June 24, 2020) ("At best, given these developments in the law, allegations regarding core operations *may* factor into a court's holistic assessment of scienter allegations, but are not independently sufficient to raise a strong inference of scienter.").

Some courts in this Circuit have found that "the doctrine can provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently." *Yannes*, 2021 WL 2555437, at *5 (alteration in original) (internal quotation marks omitted) (quoting *New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (summary order)); *see Diaz* v. *Gap, Inc.*, No. 22 Civ. 7371 (DG) (JAM), 2025 WL 1293308, at * 21 (E.D.N.Y. Mar. 31, 2025) (finding that core operation allegations "d[id] not save [p]laintiffs' scienter theory"); *Express Scripts I*, 2017 WL 3278930, at *18 ("[T]hat an allegedly fraudulent statement concerned 'core operations,' standing alone, is insufficient to support strong circumstantial evidence of scienter."); *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) ("Rather, the 'core operations' doctrine bolsters the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false." (citations omitted)).  In the

42

instant case, however, Plaintiffs' proffered bases for scienter are simply too weak to be bolstered by the core operations doctrine.

*Fourth*, Plaintiffs argue that the "temporal proximity between the August 7, 2023 statements and the October 16, 2023 admission disclosing the likely €900 million write-off further enhances the inference of scienter," and that the magnitude of that write-off serves as additional evidence. (Pl. Opp. 21-22). But "courts in this district have held that temporal proximity alone does *not* raise a circumstantial inference of fraud." *Pearlstein* v. *BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015) (internal quotation marks omitted), *aff'd sub nom. Cox* v. *Blackberry Ltd.*, 660 F. App'x 23 (2d Cir. 2016) (summary order), *and on reconsideration*, No. 13 Civ. 7060 (TPG), 2017 WL 4082306 (S.D.N.Y. Sept. 13, 2017). Similarly, "magnitude ... alone does not create an inference of scienter." *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *17 (S.D.N.Y Oct. 25, 2017) (internal quotation marks omitted) (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014)). Here, Defendants consistently disclosed write-offs and the risk of future write-offs. Accordingly, the Court finds that the approximately two-month period between Defendants' previous disclosures — which did warn about the potential for significant write-offs — and the admission disclosing likely write-offs is not strong circumstantial evidence of scienter.

*Fifth* and finally, Plaintiffs argue that "Defendants admitted to knowing that formulation changes in the vaccines would lead to write-offs for

obsolescence," and that the formulation changes planned for mid-2023 "cement[ed] the likelihood of a massive write-off." (Pl. Opp. 22). Therefore, they reason, "the only plausible inference is that Defendants knew but delayed disclosing the write-off they ultimately disclosed at the end of the Class Period." (*Id.*). The Court finds that this is not the only plausible inference, or even an equally compelling one. Defendants cautioned investors *throughout* the Class Period about the risk of write-offs, including due to changing regulatory guidance for vaccines targeting different variants.

Having considered Plaintiffs' allegations as a whole, the Court finds that the inference of scienter is not "as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. Accordingly, for this independent reason, Plaintiffs' Section 10(b) claims fail.

### 2. The Court Dismisses Plaintiffs' Section 20(a) Claims

Because Plaintiffs have failed to adequately allege their Section 10(b) claims, their claims under Section 20(a) fail as a matter of law. *Peloton I*, 665 F. Supp. 3d at 542. The Court therefore dismisses Plaintiffs' Section 20(a) claims as well.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

The Clerk of Court is directed to terminate all pending motions, adjourn all

remaining dates, and close this case.  The Clerk of Court is further directed to

modify the caption to reflect what appears on the first page of this Opinion.

SO ORDERED.

Dated:    September 30, 2025
          New York, New York

_____
            KATHERINE POLK FAILLA
          United States District Judge

45